Herman N. Bundesen, Appellant, v. A. A. Lewis et al.,
Appellees.

Gen. No. 38,768.

Heard in the second division of this court for the first district at the April term, 1936. Opinion filed June 8, 1937. Rehearing denied July 10, 1937.

MAX MURDOCK, of Chicago, for appellant.

KINNE, SCOVEL, ROBSON & MURPHY, of Chicago, for Melvena Wilson and Foreman-State Trust & Savings Bank; HARRY C. KINNE, of counsel.

EDWARD M. HERMAN, of Chicago, for appellee Michael Baumann.

OSCAR G. WAHLGREN and EDWARD N. SHERBURNE, both of Chicago, for appellee Jacob Schwartz.

Mr. Justice Scanlan delivered the opinion of the court.

Herman N. Bundesen, one of several copurchasers of certain lots, filed his bill to cancel the sales contracts and to recover the payments he had made on the same, on the grounds: (1) The subdividers, for themselves and as agents for other defendants, induced the purchase by misrepresentations. (2) The subdividers, without the knowledge of complainant, paid commissions to his copurchasers to induce the sale. (3) There was no valid contract because the purported vendor, Lincoln-Main-Gross Point Realty Trust, is nonexistent, and that name was used solely for the purpose of concealing the identities of the persons receiving the payments and the identities of the persons who might be liable or become liable as vendors. The bill also prayed for an accounting, an injunction to prevent the distribution of the payments made and to impress the land with a lien for complainant's claim, and to foreclose that lien. The parties defendant are: Albert A. Lewis and Melvena Wilson, copartners doing business as A. A. Lewis Realty Association, the subdividers who effectuated the sale; Standard Trust and Savings Bank (merged with National Bank of the Republic), trustee under Trust No. 1127, which held title to the land at the time of the sale; State Bank of Chicago, trustee under its Trust No. 2736 and Trust No. 1127, the trustee to whom the title was subsequently conveyed and to whom payments were made on the contracts in question, its successor, Foreman-State Trust and Savings Bank and the receiver of the latter institution; Michael Baumann, the original owner of the premises in question and beneficiary under both trusts; Moses P. Kaplan and Peter A. Karambelas, complainant's copurchasers under the contracts in question; and Jacob Schwartz, assignee of a part of the interest of Karambelas.

The cause was referred to the dean of the masters in chancery of this county, Wirt E. Humphrey, who filed an. able and exhaustive report, in which he found that all of the material facts alleged in the bill were proven, and recommended a decree in accordance with its prayer. The numerous objections filed by the defendants to the master's report were allowed to stand as exceptions to the report. The decree entered in the cause sustains the exceptions *to the recommendations of the master,* and contains also the following:

"3. No actionable fraud on the part of defendants, Albert A. Lewis, Melvena Wilson, Michael Baumann, the Standard Trust and Savings Bank, a corporation, as trustee under its Trust No. 1127, and the Foreman-State Trust and Savings Bank, a corporation, merged with and successor to the State Bank of Chicago, a corporation, as trustee under its Trust No. 2736, has been proven by the evidence in this cause."

"8. It is, therefore, unnecessary to consider any of the other exceptions to said Master's report filed by any of the defendants herein, and it is, therefore, necessary that said third amended bill of complaint of complainant, Herman N. Bundesen, and said cross bills of complaint of cross complainants, Peter A. Karambelas, Jacob Schwartz and Moses P. Kaplan be dismissed for want of equity."

Complainant appeals from the decree.

The contention of defendants that we should ignore the master's findings in considering this appeal is without merit. The general rule is that while the master's report is *prima facie* correct, it is advisory only. (*Union Bank of Chicago v. Gallup,* 317 Ill. 184.) In the instant case defendants have not assigned cross-error on the chancellor's failure to pass upon their exceptions to the master's findings of fact and it seems reasonably clear that at the time this appeal was taken they were willing to base their defense upon the

theory adopted by the chancellor in the decree, which is, that assuming the master's findings of fact were sustained by the evidence, the facts found do not prove actionable fraud. Although Karambelas, charged with making fraudulent misrepresentations, answered, admitting the charges of complainant and that complainant was entitled to the relief asked, the bill was also dismissed as to him. Defendants fail to show wherein any of the findings of the master upon material questions of fact are erroneous, and we are satisfied, after a careful consideration of the entire evidence, that the master was fully justified in his findings, save such as apply only to the cross-bill of Schwartz, cross appellant.

It is clear that misrepresentations were made to complainant and that they caused him to enter into the contracts. The question is, Were they actionable? Complainant contends they were. Defendants contend they were not, because they were representations as to law and not facts, and, further, if they were representations as to facts, the law charges a person with the knowledge he might have obtained by making use of the means afforded him, and that complainant failed in that regard.

It appears that the great depression played no part in the bringing of the instant suit. In July, 1928, when complainant first discovered that misrepresentations had been made to him, he complained to defendant Lewis. After efforts to adjust his claim had failed, suit was filed, on June 17, 1929. The findings of the master that there was no change in the market price of the property until several months thereafter is supported by the evidence.

About four months before the transactions here involved, the people of the State, at the November, 1924, election, ratified a statute that provided for the con-

struction, at State expense, of durable, hard-surfaced roads upon public highways of the State, along designated routes. The statute was generally known as the $100,000,000 bond issue system. (Laws 1923, p. 512, ch. 121, par. 198, Cahill's Ill. Rev. Stats.) As a part of the system the act designated Route 58 to extend from Evanston to Elgin and delegated to the Department of Public Works the duty and power to fix its detailed location. Elgin is 30 miles directly west of Evanston. At the Evanston or east end of the route, the Department made reconnaissance surveys of Simpson street, Church street and Central street, all being east and west streets running through Evanston and westward from it. After a public hearing in March, 1927, the Department designated Simpson street as part of Route 58. The office of the highway engineer received no request nor suggestion to survey any route south of Dempster street. Main street is an east and west street in Evanston situated one-half mile south of Dempster street and one and one-half miles south of Simpson street. In March, 1925, Main street continued west from Evanston approximately two and one-half miles, to a point where, unpaved and untraveled, it terminated in Lincoln avenue, which runs diagonally from Chicago northwest to Morton Grove, where it intersects Gross Point Road, nearly at right angles, at a point 500 or 600 feet northwesterly from where Main street terminates. Lewis testified that at the place in question, "Main street" "was not in existence then." Lincoln avenue was a paved street, 18 feet wide. In the south angle of the said intersection and west of the west terminus of Main street, lay a piece of farm land owned by Baumann. On March 30, 1925, defendant Standard Trust and Savings Bank took title to it from Baumann, subject to a trust agreement, of the same date, made for the sole benefit of Baumann. On that date, and pursuant to the written

direction of Baumann, the Bank entered into a written agreement with defendants Lewis and Wilson, providing for the subdivision of the farm land into lots and for the sale of the same by the copartners "in the name and behalf of Lincoln-Main-Gross Point Realty Trust." *It was provided in the agreement that it should not be recorded, and it was not.* (The agreement is hereafter embodied in this opinion.) The master found that by the agreement A. A. Lewis and Melvena Wilson, doing business as A. A. Lewis Realty Association, were made the general agents of the Bank and Baumann for the sale of the property; that Lincoln-Main-Gross Point Realty Trust was not incorporated and that no person did business under that name other than that the contracts here in question were signed in that manner by the A. A. Lewis Realty Association.

In March, 1925, defendant Karambelas conducted a retail confectionery store and restaurant at 3200 West Madison street, Chicago. S. J. Miller and Kaplan were then sales managers in the Lewis Realty Association and both had been engaged in the real estate business for some time. In March, while they were in Karambelas' restaurant they asked him if he could help them sell lots to any of his acquaintances. Later in that month he aided them in selling three lots in Krenn & Dato's properties and they paid him for his help. He did not then have a broker's license. In the latter part of the month Miller and Kaplan took Karambelas to an office of the Lewis Realty Association in Morton Grove and introduced him to defendant Lewis, who advised Karambelas to go into the real estate business and invited him to become "associated" with the said Association. A few days later Lewis, Miller and Kaplan visited Karambelas at his restaurant, where Lewis stated to Karambelas that he was going to open up a new subdivision and wanted

Karambelas "to go along with him and sell some of that subdivision." Early in April Karambelas visited Lewis's downtown offices and Lewis showed him an office in the suite and stated that he had prepared it for Karambelas, Kaplan and Miller, and that he would put Karambelas' name on the door of the office. Lewis then had the three names placed upon the door. Karambelas accepted the invitation of Lewis to become associated with the Lewis Realty Association in the sale of the lots in the subdivision in question, and the first sale in which he took part was the one here involved. For the purpose of selling the subdivision the said Association prepared a supply of blue print copies of a sales plat. This plat has on it two maps made to different scales. One represents the subdivision and shows, in detail, lots, blocks, streets, dimensions, prices and terms. The other map purports to show the territory surrounding the subdivision. At the top of the plat appears the following, in large letters: "A. A. LEWIS REALTY ASSOCIATION'S MAIN ST. AND LINCOLN AVE. 'L' SUBDIVISION." The words "MAIN ST." are in larger letters than the other words. At the top of the map showing the surrounding territory appears the following, in large letters: "MAP SHOWING LOCATION OF MAIN ST. & LINCOLN AVE. 'L' SUBDIVISION." On the map showing the subdivision there appears what purports to be a street, eighty feet wide, across which is printed, in large letters, the words "MAIN ST.," also the words, "Bus Line." At the time of the execution of the contracts in question, and prior thereto, the land in question was used as a truck garden, and this use continued for a year thereafter. There had never been a bus line at that place, and, as we have heretofore stated, Lewis testified that at the time and place in question "Main street was non-existent." The subdivision map on the plat extends westward to a point located a considerable distance

west of the north branch of the Chicago river, and Main street still appears as a street at that point. That map was designed to convey the impression that Main street extended across the entire face of the map and westward, indefinitely.

On the morning of April 9, 1925, Lewis called Karambelas into his office, showed him one of the sales plats, told him that they held their meetings on Thursday nights, and that he was going to put the subdivision on the market that night (Thursday) and pass the plats to the sales force, which then consisted of 40 to 70 men. Lewis directed the attention of Karambelas particularly to Block 1 in the subdivision, consisting of about an acre of land which the map shows fronts on ''Main street'' (and other streets). Lewis said that if Karambelas had any buyers, that would be the piece to sell them. Karambelas stated that he thought the price, $121,150, was high for the block, and that he would like to know why Lewis asked such a high price. Lewis said Main street was a State highway; that in 1923 the legislature passed a law authorizing a $100,000,000 bond issue to build hard roads, and the bill provides for a road connecting Elgin with Evanston; that Main street was that highway and that fact made Block 1 a very valuable piece of property. Karambelas asked Lewis if there would not be ''an enormous assessment as to the pavement,'' to which Lewis responded that the purchaser would get the best of it because this highway would be paid for by the State and county and that there would not be any special assessment as to the paving, except a foot or so on the curb. Lewis handed one of the sales plats to Karambelas, who then saw Kaplan and Miller in the office that had been assigned to them. Kaplan told Karambelas that Block 1 was a wonderful piece of property for anyone to buy; that Karambelas ''ought to be able to go out and sell it to someone or

get someone to go along with us, I am going to take one-third of it myself and you ought to take a piece of it yourself, and *you find some of your friends,* anybody who has a little money to invest, it will be a fine investment," to which Karambelas answered that he was not financially able to do anything right then. Kaplan then said, "You get in on this, we will all get in on this and then re-sell it and make some money," to which Karambelas answered, "All right, I think I will find somebody to dispose of the other half, if you are willing to take out of this fifty per cent two-thirds, and I will take one-third out of the other fifty per cent, maybe I will find somebody else, to sell it to them." Kaplan then said, "Fine, you go and find someone, and that will be a wonderful investment"; that the legislature had passed a law authorizing this $100,000,-000 bond issue, and Main street would be the highway connecting Evanston with Elgin, "and that was wonderful." Karambelas then called on his brother-in-law, the complainant, a physician and surgeon, who, at the time, was Commissioner of Health of the city of Chicago. The material parts of the interview between complainant and Karambelas are: Karambelas asked complainant to buy an interest in a piece of property in Niles Center, stating that the property would be on the market in the next day or so, "or possibly that night," and that it was a great opportunity to get in on the property before it was sold in small pieces; "that his boss and himself were buying a part of the property" and he wanted complainant to take a part of it; that if complainant bought a half interest in the property he and his boss would take the other half. Karambelas showed complainant the sales plat that Lewis had given him and pointed out the juxtaposition of "Main street" to Block 1; also pointed out the smaller map on the plat and stated that Main street ran west from Lake Michigan to Elgin; "that you can

see that the highway goes beyond there on the map." He also told complainant that Main street was the highway that was to connect Evanston with Elgin as part of the $100,000,000 bond issue system voted by the legislature; that the surrounding highways would be paved at public expense and there would be no assessments on the property except for curbing; that if complainant or any of his friends "wanted to get in on a good thing they should come in on that." Complainant referred Karambelas to Major Percy Owens as one who might be interested, and Karambelas then called on the latter. Karambelas then made a report to Kaplan of his talk with complainant. There was another meeting that day, at complainant's office, at which were present complainant, Karambelas, Kaplan and Owens, and the statement was again made to complainant that the property was located on the Evanston-Elgin highway. Karambelas stated that he and Kaplan would take a half interest in the property if complainant and "whoever" he could get to go in with him would take the other half interest. Kaplan stated that it was a very valuable piece of property. Karambelas then went to Lewis and told him that he had customers for all of Block 1 and asked him for his "bottom price." Lewis asked him if he thought his customers would pay $110,000 for the property, to which Karambelas answered that he thought they would. Lewis stated that he had a lot of salesmen who were anxious to sell the property in question "to their friends." Lewis then fixed a price of $110,000 for Block 1. Thereafter Kaplan, Karambelas, Owens and complainant met at the latter's office and agreed to buy the block at that price, Kaplan to take one-third, Karambelas one-sixth, Owens one-fourth, and complainant one-fourth. A deposit was paid that day and a preliminary contract executed. Lewis testified that the deposit was paid prior to the "sales meeting." Complainant had never

seen the property, did not look up any records concerning it, and did not consult a lawyer. He had seen statements in the newspapers that the State was spending $100,000,000 on a system of highways. He bought the property because he believed and relied upon the representations made to him concerning it, and he also assumed that the sales plat truly represented the situation. He knew nothing to the contrary until long after the execution of the contracts and the payment of a large part of the purchase price. The formal contracts were executed April 15, 1925. They were prepared in the office of the Lewis Realty Association, on printed forms, drafted in accordance with the written agreement between Standard Trust and Savings Bank, ''Trustee under Trust No. 1127,'' and defendants Lewis and Wilson. The contracts describe ''Lincoln Main & Gross Point Realty Trust, of which Standard Trust & Savings Bank is Trustee, under trust No. 1127, party of the first part,'' as vendor, and complainant, Karambelas and Kaplan as the vendees. The initial payment of $24,000 was made by the purchasers in the ratio agreed upon among themselves. In payment of his share Karambelas gave to Lewis and Wilson his personal note for $4,000, dated April 16, 1925. On the same date he received back from them a voucher for $5,500 reciting that it was five per cent commission on the contracts in question and that the commission was paid ''By note $4,000.00, check herewith $1,500.00.'' At the same time Karambelas was handed his note and a check for $1,500 signed by the Lewis Realty Association. Kaplan also received from the said Association a commission upon the transaction, the amount of which is not shown in the record. *The commissions were paid Karambelas and Kaplan pursuant to an agreement they had with Lewis prior to the time of the agreement with complainant.* Lewis testified, in the instant cause, that he

*figured* that the commissions he paid Kaplan, Karambelas and Miller would be credited by them on the price of the property; but in April, 1931, he testified that he paid commissions to Karambelas, Kaplan and Miller and that "what they did with it I don't know." The undisputed evidence is that the three parties kept the commissions paid them, and that none of them informed complainant as to the agreement for commissions nor the payment of the same. Nor did Lewis inform complainant as to the commissions. Complainant had no notice nor knowledge of the payment of the commissions until after he had learned of the falsity of the representations that had been made to him. Until then he paid his *pro rata* share of the monthly instalments and interest in accordance with the terms of the contract. About two months after the signing of the contract Owens told complainant that he was financially embarrassed, and complainant reimbursed Owens the amounts he had paid, and thereafter complainant paid one-half share of the monthly instalments and interest. Kaplan defaulted in his payments, and as each copurchaser was liable for the whole amount complainant assumed this additional burden, gave his check to defendant State Bank of Chicago, Trustee, on October 8, 1927, for $10,862.65, the amount that Kaplan was in arrears, and took an assignment from Kaplan. *Under the contracts complainant was a joint purchaser of the entire block.* Complainant made payments until about July 1, 1928, when he consulted his banker in reference to refinancing the property. He told the banker that the property was on a State highway, and the banker then informed him that it was not, and that the statements that had been made to him concerning the property were false. This was the first notice or knowledge complainant had of the falsity of the said statements. Thereafter he made no payments on the contracts but

began negotiations with Lewis and the attorney for
Wilson for redress, during which complainant learned
for the first time that commissions had been paid by
Lewis to Karambelas, Kaplan and Miller. The
amounts paid on the purchase price of the property
were $65,455 principal, $11,997 interest, and $206.39
taxes, a total of $77,688.39, of which complainant paid
$52,681.25.

"Fraud in its generic sense, especially as the word
is used in courts of equity, comprises all acts, omis-
sions, and concealments involving a breach of legal
or equitable duty and resulting in damage to another.
Fraud has also been defined· as cunning or artifice used
to cheat or deceive another." (26 C. J. 1059.)

"Fraud may be found from a variety of circum-
stances. There is no general rule for determining
what facts will constitute it, but it is to be found or
not according to the special facts of each particular
case. It may consist in a misrepresentation, that is,
in the positive assertion of a falsehood, or *in the crea-
tion of a false impression by words or acts, or by any
trick or device,* or in a concealment or suppression of
the truth, or in both a suggestion of falsehood and a
suppression of truth together. And it matters not,
so far as the right of action is concerned, whether the
means of accomplishing the deception be complex or
simple—a deep-laid scheme of swindling or a direct
falsehood—a combined effort of a number of asso-
ciates or the sole effort of a solitary individual—pro-
vided the deception is effected and the damage com-
plained of is the consequence of the deception." (12
R. C. L. 232. Italics ours.)

"The Century Dictionary defines fraud as 'an act
or course of deception deliberately practiced with the
view of gaining a wrong or unfair advantage; deceit;
trick; an artifice by which the right or interest of an-

other is injured.' In Story's Equity Jurisprudence (vol. 1, secs. 186, 187,) it is stated that fraud, in its general sense, comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence and resulting in damage to another. This definition is approved in *Diversey v. Johnson*, 93 Ill. 547, and 26 Corpus Juris, 1059. Bouvier's Law Dictionary (vol. 1, p. 843,) states that active and positive fraud includes cases *of the intentional and successful employment of any cunning, deception or artifice to circumvent, cheat or deceive another."* (*Eliason v. Wilborn*, 335 Ill. 352, 357–8. Italics ours.)

"The charge in this case is fraud—that the judgment was procured as a fraud upon the city and that the assignment of the cause of action was a fraud upon Dora Sampson. Fraud includes anything calculated to deceive, whether it be a single act *or combination of circumstances,* whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture. (Bishop's Equity, 206.)" (*People v. Gilmore*, 345 Ill. 28, 46. Italics ours.)

" ' . . . "If one conducts himself in a particular way, with the object of fraudulently inducing another to believe in the existence of a certain state of things, and to act upon the basis of its existence, and damage resulted therefrom to the party misled, he who misled him will be just as liable as if he had misrepresented the facts in express terms." (*Northeastern Railway Co. v. Wanless*, L. R. 7 H. L. 12; *Downey v. Finucane*, 205 N. Y. 251 [98 N. E. 391, 40 L. R. A. (N. S.) 307.] . . . ' " (*Pennebaker v. Kimble*, 269 Pac. (Ore.) 981, 984.)

"A person who, by conduct, contributes to the misapprehension of another as to a material matter, and intentionally fails to correct the misapprehension, is

guilty of a fraud." (*Bell v. Felt,* 102 Ill. App. 218, 227.)

"A false representation need not necessarily be an oral, printed or written statement, *but may arise from any conduct capable of being turned into a statement of fact;* and negligence cannot be imputed to a defrauded party, so that he who commits the fraud may escape liability." (*Smith v. Niemann,* 216 Ill. App. 179, 185. Italics ours.)

"Implied Representations; Maps and Plats.—To constitute a misrepresentation it is not essential that there be a direct affirmation as to the existence of a certain state of facts. This is exemplified in the cases where maps and plats are exhibited which purport to show the general characteristics and surroundings of the land, as where in case of a sale of timber land a map or plat of the land is exhibited showing a fine stream of water and a mill site which were essential to the marketing of the timber, whereas in fact the indicated stream was merely a gully carrying water only a small part of the year; or where in the sale of town lots in a new development a map is exhibited by the vendor showing a street material for access to the lots, which in fact did not exist or was a private way laid out by others on their own land." (27 R. C. L. 364–5.)

In *State v. Gaillard,* 1 Am. Dec. (S. C.) 628, the alleged fraud consisted of a false showing on a plat. The court, in holding that the purchaser had a right to rely on the plat, states (p. 631):

"*There was nothing better calculated to impose upon a purchaser than a plat which had the appearance of an actual survey and observation, with explanatory notes made upon it.*" (Italics ours.)

In *Chatham Furnace Co. v. Moffatt,* 147 Mass. 403, 18 N. E. 168, the court held that a purchaser of property had a right to rely upon the accuracy of a survey of the premises submitted to him.

In *McCall v. Davis*, 56 Pa. St. 431, in holding that the vendor of property was bound by the plan and plat of a subdivision which he exhibited to the bidders, the court said (p. 434):

"When, therefore, Davis produced his plot to the bidders at the public sale, exhibiting East street as one of the streets in his plan, and referring to nothing on its face to correct this impression or to inform the bidders that it was laid out by others on their own ground, *it was an act which affirmed, as loudly as words could speak, that this was a street dedicated by him to the use of those who should become purchasers of his lots. It was an affirmation of a positive fact, which if material entered directly into the consideration of the purchase*; and if false is a ground of relief in equity, when its falsity was unknown to the purchaser and when he has taken no covenant to protect himself." (Italics ours.)

In *Irwin v. Lido Realty Corp.*, 250 N. Y. 310, a suit to compel specific performance of a contract, the plaintiff purchased real property of the defendant "on a map showing the street in front of the premises, Fair Way avenue, running to the ocean. He was offered a deed according to a map which did not run Fair Way avenue to the ocean." The Court of Appeals of New York held that while the plaintiff was not entitled to all the relief asked for, he was entitled, at his election, to have judgment for the amount paid, with interest, or to receive a deed giving him access over Fair Way avenue to the ocean.

In *Owens v. Union Bank of Chicago*, 260 Ill. App. 595, it was held, by the first division of this court, that a misrepresentation of the location of real estate which induced a purchaser to enter into a contract is a ground for voiding the contract. It was further held that a representation by a real estate agent to a prospective purchaser of unimproved real estate that he knew that such real estate would be located in a

certain city and that he was well acquainted with the facts and knew from definite sources that it would be so located, was not a prophecy of future developments nor a representation merely boosting the property, but was a representation as to the location of the property. (See cases cited therein in support of the ruling.)

In *Victor v. Kurzon,* 287 Ill. App. 634 (Abst.) (opinion filed by this division of the court), the trial court sustained defendant's motion to strike plaintiff's complaint and amendment thereto, and plaintiff electing to stand on his complaint as amended judgment for costs was entered against him. The plaintiff sued defendants to recover damages on account of the alleged fraud of defendants in connection with the exchange of two pieces of real estate, both located in Chicago. Plaintiff's complaint as amended contains, *inter alia,* the following:

"That at least thirty (30) days prior to the execution of said contract of exchange, the exact date of which the plaintiff is unable to state, the said defendants, to induce the plaintiff to make such exchange, fraudulently, maliciously and falsely submitted to plaintiff plans and specifications for the apartment building located on the premises described in the second paragraph hereof, in which it was shown that the said apartment building was fully equipped with and that there had been erected therein an approved automatic pump, having a capacity of not less than 500 gallons per minute to supply the standpipe with water, which was a full compliance with and in accordance with the fire ordinance of the City of Chicago regulating the construction of such an automatic pump in apartment buildings of the size and character of the one erected on the premises described in the second paragraph hereof, which plans and specifications are made a part hereof by reference and copies of the

relevant or material parts of said plans and specifications are hereto attached, marked Exhibits 'A' and 'B' and made a part hereof. (Exhibit 'A' is a plan or plat of the basement floor of defendants' apartment building, which shows fire service equipment. Exhibit 'B' contains the specifications and requirements of 'Fire Pump Equipment.')

"That the portions of said plans and specifications showing that said apartment building was fully equipped with and that there had been erected therein an automatic pump or sprinkler system, were false and untrue and were known to the defendants to be false and untrue, and that said plans and specifications were submitted to the plaintiff with the intention and purpose of making the plaintiff believe that the said apartment building was equipped with and that there had been erected therein a sufficient automatic pump or sprinkler system, all of which were known to the said defendants to be false and untrue, and were made with the intent and purpose of deceiving plaintiff into executing the said contract for the exchange of said properties.

"That the plaintiff believing and relying upon the truth of the statements and showing with reference to such automatic pump or sprinkler system, as contained in said plans and specifications, as hereinbefore alleged, executed the said contract of sale and subsequently carried out and performed said contract of sale by conveying the property owned by him and described in the first paragraph hereof to the Foreman Trust and Savings Bank, as trustee, and received the conveyance of the property described in the second paragraph hereof from the said Foreman Trust and Savings Bank, as trustee."

The complaint also alleged, in effect, that because no such pump had been erected by defendants in the building plaintiff was compelled by the authorities of

the city of Chicago to erect, at his own expense, such a pump in the building, in compliance with section 1301 of the Fire Prevention Ordinances of the city of Chicago. We held that the complaint as amended made out a *prima facie* case of actionable fraud, and that where parties are guilty of fraudulent conduct whereby they induce another to act they will not be allowed to impute negligence to the latter as against their own deliberate fraud.

In *Hicks v. Stevens,* 121 Ill. 186, wherein one of the elements of alleged fraud consisted of statements made in printed circulars in reference to the patent or invention involved in the case, the court said (p. 197):

"There was no error in admitting in evidence the printed circular of Hicks, showing the valuable qualities of his invention. The proof shows that he gave Stevens one of them during their negotiations, containing material and important representations of what his invention would accomplish as a means of saving steam and fuel,—that it would save its cost in a month,—while the proof showed that, practically, it was of no value in the respect mentioned in the circular. These circulars were printed and distributed for the purpose of inducing others to purchase rights of him, *and the statements therein may be regarded as of a more deliberate character than if made in a conversation.* They were properly admitted. See 2 Pomeroy's Eq. Jur. sec. 881, and also Cooley on Torts, 477." (Italics ours.)

Under the facts and the law applicable to the same, we hold that the chancellor erred in decreeing that complainant had failed to prove a case of actionable fraud.

As to the point made by defendants that the law charges complainant with the knowledge he might have obtained by making use of the means afforded

him, the evidence shows that Lewis, Kaplan and Karambelas were engaged in a scheme to defraud complainant; that they were guilty of fraudulent conduct whereby they induced complainant to act, and they will not be allowed to impute negligence to the latter as against their own deliberate fraud. (*Pustelniak v. Vilimas,* 352 Ill. 270. See also *Antle & Bro. v. Sexton,* 137 Ill. 410, 413–4; *Linington v. Strong,* 107 Ill. 295, 302–3; *Herpich v. Williams,* 300 Ill. 540, 545–6; *Carver v. VanArsdale,* 312 Ill. 220, 230; *Victor v. Kurzon, supra.*) From certain arguments advanced it would appear that defendants assume that the doctrine of *caveat emptor* applies to the instant question. Equity always attacks fraud and never throws a shield around it. It would be a strange rule of equity if schemers to defraud, when called to account, could successfully interpose as a defense the plea that the scheme would not have succeeded had the victim been cautious. Furthermore, the evidence shows that complainant was "rushed" into the contracts by statements that the property would be placed in the hands of the 40 to 70 salesmen of the Lewis Realty Association that night and that he must act speedily if he wished "to get in on a good thing." The use of complainant's brother-in-law was apparently intended to throw complainant off his guard. It will be noted that Lewis and Kaplan both urged Karambelas to try and sell the property to some of his friends. The fact that Karambelas and Kaplan told complainant that the property was such a great bargain that they would join him in buying it, was also calculated to steal away complainant's sense of caution.

We are unable to agree with the strained argument of defendants that the alleged misrepresentations were not actionable because they were misrepresentations as to law and not misrepresentations as to facts. The misrepresentations on the map were misrepresenta-

tions of fact, not of law. Lewis's statement that Main street was the State highway connecting Elgin and Evanston was a misrepresentation of fact, not of law. Had complainant been familiar with the provisions of the bond issue act, that fact would not have put him on notice that Main street was not to be a part of the road connecting Elgin with Evanston. The law provided that existing public highways be used. The selection of the highways by the Department of Public Works was a discretionary act. That part of the map which purported to show that "Main street" at the place in question was an existing highway and that there was a bus line on it was a misrepresentation of fact. A suppression of the truth may amount to a fraud. (*People v. Gilmore, supra,* p. 46.) The suppression of the fact of payment of the secret commissions was not a misrepresentation as to law.

Citing *Beiman v. Union Bank,* 255 Ill. App. 11; *Felt v. Bell,* 205 Ill. 213; *Chicago Title & Trust Co. v. Schwartz,* 339 Ill. 184; *Mohnk v. Seyfarth,* 339 Ill. 371, 379, complainant strenuously contends that the payment of the secret commissions by Lewis and Wilson to certain copurchasers without the knowledge of the other copurchaser, complainant, was a fraud upon the latter which alone would justify rescission of the contract. Complainant's theory of fact as to the secret commissions is fully sustained by the evidence. The claim of Lewis that it was his intention that the commissions should operate as a reduction of the net price for the common benefit of the copurchasers is clearly an afterthought. If Lewis and Wilson intended that the commissions should operate as a reduction of the net price for the common benefit of the copurchasers, why was not the net price stated in the contracts, so that complainant might be apprised of that fact? The price stated in the contracts is $110,000. Why did they, at the time of the closing of the contracts, resort

to the deception of taking Karambelas' note of $4,000, ostensibly as a payment, when Lewis knew that, in accordance with the secret understanding, it would be returned to Karambelas, together with the Lewis Realty Association's check for $1,500, in payment of the commission Lewis promised Karambelas? Why did not Lewis see to it that complainant was apprised of the commissions paid? He did not testify as to the method employed in paying Kaplan his commission. Neither Kaplan nor Miller testified. The three copurchasers signed all of the contracts jointly and each assumed liability for the whole price. Complainant was entitled to a full disclosure by defendants of any special arrangement, by commissions or otherwise, which Lewis and Wilson had with complainant's copurchasers. Complainant assumed, as he had a right to do under the circumstances, that Kaplan and Karambelas were paying, in cash, their shares ($8,000 and $4,000, respectively) of the $24,000 down payment; that having these sums at stake they were motivated by interests akin to his own, and that their statements and advice to him were not colored by secret interests. Karambelas brazenly testified that his controlling motive in getting complainant to sign the contracts was to secure the commission promised him by Lewis. Aside from the question as to whether or not the secret commissions, alone, warranted the rescission of the contracts, the facts and circumstances in relation to the commissions tend strongly to support complainant's contention that he was defrauded by defendants by means of misrepresentations.

Complainant contends that the contracts of sale are invalid because there was no evidence that the vendor was an individual, a partnership, or a corporation; that the evidence and the admissions of defendants abundantly support the allegations of the bill that defendants used the name of the purported vendor, ''Lin-

coln-Main-Gross Point Realty Trust,'' for the purpose
of fraudulently concealing from complainant the ex-
istence and identity of the real vendor and the iden-
tities of the beneficiaries and recipients of the pay-
ments to be made under the contracts, for the further
purpose of concealing the names and identities of the
persons who were liable, or might become liable, as
vendors, and for the purpose of avoiding any liability
on the part of themselves or any other persons; that
such contracts are void, and complainant is entitled
to recover back his payments; that such concealment
was an active fraud upon complainant, for which all
of the participants would be liable to him in a common
law action of deceit, and that they are no less liable
in equity. We are satisfied that the contracts were
not void for want of a vendor (*Beilin v. Krenn & Dato,*
350 Ill. 284), but we feel impelled to say, however, that
the methods employed to conceal the identity of the
real owner of the property do not accord with com-
mon honesty. The unrecorded contract of Lewis and
Wilson with Baumann and the Standard Trust and
Savings Bank was produced in court practically by
compulsion, and it was only then that complainant
knew of the connection of Baumann with the prop-
erty. After a review of the record in this and other
cases that have come before us, we can readily under-
stand why a great many purchasers of real estate be-
fore the great depression discovered, when the depres-
sion came, how difficult, if not practically impossible,
it was to find any responsible parties back of the
contracts.

In re liability of Lewis and Wilson: The master
recommended that a decree be entered in favor of
complainant and against Lewis and Wilson, and we
find and hold that this recommendation was fully war-
ranted by the proof. Defendants Lewis and Wilson
practically concede that Karambelas (and possibly

Kaplan) was not honest in his dealings with complainant, but they seem to assume that the fact that Karambelas was a brother-in-law of complainant tends to relieve them from the effect of his conduct. Lewis induced Karambelas, a restaurant man, to join his organization, assigned to him an office in the suite of the Lewis Realty Association, and placed his name on the office door. He signed the application of Karambelas for an associate membership in the Chicago Real Estate Board, as an employer and sponsor, when he knew that several of the material statements in the application were false. Lewis suggested to Karambelas that he sell the property to some of his friends, he made false representations to Karambelas as to the property, furnished him with the untruthful and deceptive plat, and sent him out with the warning that if he had any customer in mind the latter must act quickly as he intended to turn over to his salesmen, that night, the sale of the entire subdivision. It was by repeating to complainant the false representations made to him by Lewis and by exhibiting to the former the plat that Karambelas was able to deceive complainant. Lewis knew that the action of Karambelas and Kaplan in joining in the purchase was calculated to deceive complainant, and by his silence, when common honesty required him to apprise complainant of the agreement as to the commissions, Lewis prevented complainant from knowing that his copurchasers were not acting fairly and honestly towards him. Lewis and Wilson argue that if fraud was practiced against complainant, it was the fraud of the latter's copurchasers. Aside from the fact that Lewis planned the fraudulent scheme and that Karambelas and Kaplan were his tools, the two latter, like Miller, were employees and agents of the Lewis Realty Association. Kaplan and Karambelas have not appealed from the decree dismissing their cross-bills, and Lewis

and Wilson, in their brief, suggest that a decree against the former two might be justified. The master was also warranted in finding that the misrepresentations were material and were calculated to create a fictitious value for the property. The mere statement that Lewis was able to fix a price of $110,000 for Block 1, situated upon a truck farm, sufficiently shows the effect of the misrepresentations. As a *dernier ressort* Lewis and Wilson contend: ''There was a frame·farm house, with a brick foundation, upon the premises at the time of the execution of the contract. This house was wrecked by Karambelas at the order of Bundesen. Therefore, Bundesen would not be able to place defendants in *status quo* even though he may so desire.'' As to this contention the master made the following finding:

''At the time of the execution by the complainant of the contracts in question there was located upon the premises described in said contracts, an old four or five room frame farm house with a brick foundation. This farm house was still upon said premises when said complainant saw same about two years after the contracts were signed. At the time the complainant first saw the premises the windows were broken out and the building partially wrecked. The witness Karambelas testifies that some time after that, he had 'a call from somebody in Niles Center that somebody might get hurt, and I said, ''Go ahead and wreck it,'' and they did wreck it.' He further testifies when asked the question, 'Did you talk to Dr. Bundesen before it was wrecked?' 'I don't know whether I did or not. The house was all wrecked up. I think I told him the house was all wrecked up, everything wrecked, nothing left.' And in answer to the question, 'What did he say?', the witness says, 'He didn't say anything.' It does not appear that the complainant was in any wise responsible for the wrecking of the

building or the removal of same, nor is there any evidence of the value, if any, of said building at that time. The execution of said contracts setting aside the Bundesen lots as 'business property' with definite restrictions as to values and building lines, necessarily presupposed the early removal of the old farmhouse which was not mentioned in said contracts.''

The agreement of March 30, 1925, provides that the beneficiary of the trust, Baumann, should vacate the farmhouse one year after the date of the agreement. It was vacated at the expiration of the year, and the inevitable happened, "the house was all wrecked up . . . nothing left.'' If the farmhouse had had any value at the time it was removed the able attorneys for defendants would have introduced evidence upon the subject. The evidence fails to show that Lewis and Wilson made any objection to the removal. They were engaged in a plan of converting a truck farm into lots, and, undoubtedly, they considered the ruins of a farmhouse a liability instead of an asset. Its removal was a natural consequence of the changed situation. Baumann makes no point as to the removal. Whether Lewis and Wilson, in the matter of the contracts with complainant, acted as owners of the property or as mere sales agents, they are responsible to complainant because of the fraudulent misrepresentations that caused the latter to execute the contracts.

In re liability of Karambelas and Kaplan: Neither Karambelas nor Kaplan appears here to defend the decree. The mere statement of the facts surrounding the transaction shows that complainant is entitled to a decree against them. Kaplan had had long experience in the real estate business and at the time in question was a sales manager for Lewis and Wilson and took an active part in the scheme to defraud complainant. Karambelas and Kaplan were employees and agents of Lewis and Wilson and willing tools of

Lewis in the transaction. Solely to gain the secret commission, Karambelas entered into the scheme, although the party to be defrauded was his brother-in-law.

In re liability of Michael Baumann: The master recommended that a decree be entered in favor of complainant and against Baumann. His recommendation was based upon the following finding:

"That by said contract of March 30, 1925, and by the direction of said Michael Baumann, beneficiary to the Bank to execute same, the said A. A. Lewis and Melvena Wilson, doing business as A. A. Lewis Realty Association, were made the general agents of said Standard Trust & Savings Bank and said Baumann for the sale of said property with certain limitations as to form of contract and name in which contracts were to be made, and as to maximum and minimum prices to be placed upon said property."

Complainant argues that the evidence warrants a finding that by the methods employed in connection with the property Baumann assisted Lewis and Wilson to perpetrate the fraud upon complainant, but we deem it unnecessary to pass upon this contention, although we may state that the facts tend to show that Baumann was not an innocent farmer, as claimed by his counsel. The price fixed for the property shows that he was a shrewd business man. A reading of the various agreements will show that he acted throughout under the advice of a lawyer. It was by means of the provisions of the trust agreements that the instruments should not be recorded that the interest of Baumann in the contracts made by Lewis and Wilson remained a secret, so far as complainant and the public were concerned, until a considerable time after the instant suit was commenced. The agreement of March 30, 1925, shows how fully Baumann's rights in the premises were protected. It is significant that

he neither testified nor offered any proof in his behalf. As to Baumann, the only question necessary for us to determine is, Did the contract of March 30, 1925, constitute a sale of the property to Lewis and Wilson, or did it make the latter agents for Standard Trust and Savings Bank and Baumann in the sale of the property? On March 30, 1925, Standard Trust and Savings Bank took title from Baumann, the owner of the property, subject to trust agreement No. 1127, of the same date, which made Baumann the sole beneficiary under the trust. In order to determine the relationship between Baumann and Lewis and Wilson it is necessary to consider all parts of the following agreement:

"THIS AGREEMENT, Made and entered into this 30th day of March, 1925, between Standard Trust & Savings Bank, a corporation, Trustee under Trust No. 1127, party of the first part and Albert A. Lewis and Melvena Wilson, co-partners doing business as A. A. Lewis Realty Association, parties of the second part, WITNESSETH, That,

"WHEREAS, the party of the first part is the owner as Trustee, of the following real estate situated in County of Cook and State of Illinois, to-wit: (Here follows the legal description of the property in question.)

"WHEREAS, said Trustee has been instructed by the beneficiary under said Trust to enter into this agreement;

"Now, THEREFORE, in consideration of the premises and of the mutual covenants and agreements of the parties hereto hereinafter set forth, it is hereby covenanted and agreed by and between the parties hereto as follows:

"ARTICLE I.

"The parties of the second part shall have the said real estate subdivided and platted as soon as possible,

in substantially the manner shown by proposed plat hereto attached, marked Exhibit 'A', and said plat approved by the proper authorities and recorded in the Recorder's office of Cook County, and the party of the first part shall execute any such plat or plats at the request of parties of the second part.

## "Article II.

"Simultaneously with the execution hereof, the parties of the second part shall deposit with Michael Baumann, the original beneficiary under said trust No. 1127, contracts heretofore entered into between Lincoln, Central & Main Realty Trust, and the purchasers of lots in Lincoln Avenue, Central & Main Street 'L' Subdivision, upon which contracts there shall be an aggregate unpaid balance of the purchase price of premises described therein of at least Fifty Thousand Dollars, which said contracts shall be assigned in manner satisfactory to said Michael Baumann, so as to vest in said Baumann full right and authority to hold same as security for the carrying out of the provisions hereof, and in the event of default by party of the second part under terms hereof, to vest in said Baumann the absolute ownership in said contracts, and the right to direct the conveyance of title to the lots described in said contracts. The direction in writing to the party of the first part by said beneficiary to execute this contract shall be conclusive evidence of the deposit of such contracts with said Baumann by the parties of the second part.

## "Article III.

"Section 1. The parties of the second part are hereby given the exclusive right and authority during the period of ninety days after the recording of plat provided for in Article I, or during any further exten-

sion of time hereinafter provided for, to sell the real estate hereinabove described or any part or parcel thereof, and to that end they are hereby authorized and empowered during such period of ninety days, or such further period as may be hereinafter provided for, to enter into and execute contracts for the sale of said real estate or any parts or parcels thereof, in the name and behalf of Lincoln-Main-Gross Point Realty Trust at prices which shall be at least seventy-five per cent and not more than 125% of amount designated as the selling price of each lot in the Price Schedule hereto attached as Exhibit 'B'. Said contracts shall be substantially in the form of the contract hereto attached marked Exhibit 'C', and shall include agreements by the trust estate:

"(1)   To furnish the purchaser a Torrens Certificate or guaranty policy issued by Chicago Title and Trust Company to each lot described in said contract or contracts.

"(2)   To install by private contract, and without expense to the purchaser sidewalks in front of all lots and along the street side of corner lots.

"In all cases where the full purchase price is not paid in cash, the parties of the second part shall require at least twenty-five per cent thereof to be paid in cash at the time of the execution of the contract of sale, and such contracts shall in all cases, further provide:

"(1)   That the balance of the purchase price shall be paid in not more than forty-eight monthly installments.

"(2)   That the monthly installments shall be not less than 1½% of entire purchase price per month, with interest upon the amount remaining from time to time unpaid if interest is payable on each installment as the same matures, or such monthly installment shall be not less than 1% of entire purchase price per month

if the interest upon the entire balance remaining from time to time unpaid on said contract is to be payable monthly.

"(3) That interest at the rate of 6% per annum from the date of the execution of the contract shall be paid in one of the two methods above provided.

"(4) That the full amount of the purchase price, together with interest due and payable thereon shall, in any and all events, be due and payable within four years from the date of the execution of the contract of sale.

"(5) That the said payments shall be made to A. A. Lewis Realty Association at its office, or in the event of forfeiture of this contract to such other person or corporation, and at such other place as the party of the first part may in writing from time to time direct.

"(6) That purchasers of said lot or lots shall agree to assume and pay for all special assessments of record, or which may be hereafter passed, levied or placed of record, real estate taxes, and for sewerage, drainage or water extension.

"The parties of the second part may, in their discretion, allow a discount of not to exceed five per cent from the selling price of each lot, as the same has been fixed by provisions hereinabove made, in case of a sale for all cash, and in cases where the full balance of an installment contract is paid in cash, the said parties of the second part may allow a discount not to exceed one per cent of such balance for each year that such balance if paid prior to maturity of the contract.

"Section 2. All moneys paid on the purchase price of lots sold hereunder and all installments paid on contracts for the sale of the real estate herein described, shall, as long as this contract remains in full force and effect, be paid to and received by the parties

of the second part, which service shall be rendered by parties of the second part without charge. From the first payment made under each contract, the parties of the second part shall be entitled to deduct seventeen per cent of the purchase price.

. ''Section 3. After deducting from the moneys received and collected by them the amount above specified, the parties of the second part shall, on the 1st and 15th days of each month, account for and pay over to Niles Center State Bank, as agent for said beneficiary, all of the balance of the moneys received and collected by them, and deliver to the said Bank:

''(a) A detailed sworn statement and accounting of the business of the Trust Estate for the period since the preceding statement, and,

''(b) A copy of all contracts, and said parties of the second part shall also at the same time deliver to party of the first part copies of said statements, and also all original contracts received by them and belonging to the Trust Estate.

''Section 4. The parties of the second part shall without charge to beneficiary, also make collections upon contracts deposited with beneficiary, as First Deposit and Second Deposit, and pay same over to said Niles Center State Bank at same times and with similar sworn statements as above required in preceding section.

''Section 5. The parties of the second part shall, within five days after date hereof, furnish beneficiary a surety bond in the penal sum of Fifteen Thousand Dollars in a surety company satisfactory to the beneficiary, and conditioned that said surety company shall make good any default or failure of second parties to turn over any moneys due said beneficiary or payable to said Niles Center State Bank as and when same is due under provision of this contract.

"Section 6. The parties of the second part may, in their discretion, and shall, upon the written request of the beneficiary or party of the first part, and at the expense of said parties of the second part, take such steps as are required under the terms and provisions hereof, to cause a forfeiture of any contract of sale theretofore executed by them which the vendor is entitled to forfeit by reason of any default or defaults on the part of the vendee therein named.

## "Article IV.

"Section 1. The parties of the second part guarantee to sell or cause to be sold, within ninety days after the recording of subdivision plat hereinbefore provided to be made by them, and upon the terms and upon payments hereinbefore specified, lots and parcels of the said real estate heretofore described to the gross amount of Two Hundred Seventy-one Thousand and Eighty-four Dollars, and to pay over to Niles Center State Bank, in accordance with the provisions hereof, the amounts collected upon such sales, and to turn over to party of the first part duly executed contracts representing such sales.

"Section 2. The parties of the second part shall not acquire any interest in the contracts for the sale of said lots or tracts except the right to retain seventeen per cent of the sale price of such lots or tracts, same to be deducted from the first payments as aforesaid or in or to the cash realized from sale of any such lots or tracts until such time as parties of the second part become beneficiary as provided herein upon Change of Beneficiary.

"Section 3. In the event that the parties of the second part shall fail or refuse to comply with the provisions of the preceding section, then at the end of said ninety day period, the parties of the second part shall

deposit with the said beneficiary under said trust agreement, additional contracts relating to property in same subdivision as contracts described in Article II and similar in all other respects to the said contracts described in Article II and assigned to said beneficiary under same form of assignment as said contracts first deposited and upon which contracts there shall be an aggregate unpaid balance of the purchase price of the premises described therein of at least Fifty Thousand Dollars, none of which contracts shall be in default, and which deposit shall be hereinafter designated as the 'Second Deposit.' Upon the failure of said parties of the second part to make said second deposit of contracts when same shall be due under the terms hereof, this contract shall be terminated and cancelled and all rights of the parties of the second part hereunder shall cease and determine and thereupon all contracts deposited with said beneficiary shall be and become the absolute property of said beneficiary as and for liquidated damages for the breach of this contract by said second parties, it being specifically agreed by and between the parties hereto that on account of damages for such breach being difficult of ascertainment, they have fixed same at the sum aforesaid.

"Upon such termination of this contract, all proceeds of said trust, in the hands of said trustee, shall remain the absolute property of the beneficiary under said trust, free from any claim whatsoever of the parties of the second part and all contracts with purchasers shall be assigned by party of the first part to beneficiary by proper form of assignment.

"Upon such termination of the contract parties of the second part shall turn over to said Niles Center State Bank any moneys in their hands belonging to said trust estate and shall turn over any contracts to party of the first part.

"Section 4. In the event that the parties of the second part shall place with said beneficiary said Second Deposit, then and in that event the exclusive right of said second parties to sell said real estate shall continue for nine months from and after the termination of said ninety day period, upon the same terms and conditions as hereinabove provided for the said first period of ninety days. If, at the termination of said nine month period, the said second parties shall not have complied with the requirements of Section 1 of this Article, then this contract shall thereby be terminated and cancelled, and the total amounts of contracts so deposited with said beneficiary shall be and become the absolute property of said beneficiary as liquidated damages, and all right, title and interest whatsoever of said parties of the second part under this contract or in and to the trust estate herein mentioned shall cease and be determined, and the entire trust estate shall remain the absolute property of said Michael Baumann, or whoever shall have succeeded to his beneficial interest under the terms of said trust agreement. The sworn statement in writing by said beneficiary to party of the first part that either said First Deposit or said Second Deposit has not been made shall be conclusive evidence so far as said trustee is concerned of default in that regard on the part of second parties.

"Section 5. The parties of the second part shall have the right to substitute for any contract, deposited by them under any of the deposits mentioned herein, which is paid up and the vendee in which is entitled to a deed, a contract or contracts upon which there shall be an unpaid balance of purchase price at least equal in amount of unpaid purchase price in said contract or contracts so desired to be withdrawn, which contracts offered in substitution shall be made available for use as security as provided in Article II, and shall be for sale of property in the same subdivision as contracts

mentioned in Article II, or in subdivision to be made of property herein described.

"The parties of the second part shall, within thirty days after notice in writing given by said beneficiary to said parties of the second part, replace any contracts deposited by them with said beneficiary, in which vendee shall be in default for at least thirty days, with contracts with same amount of unpaid purchase price thereon, which shall comply with provisions of Article II, and of preceding paragraph of this section.

## "ARTICLE V.

"The parties of the second part shall, so long as this contract is in full force and effect, have the right to direct the conveyance to purchaser of any part of said real estate heretofore described which shall have been sold under contracts deposited with the party of the first part, upon compliance with the following conditions:

"1.  Said parties of the second part shall present, with said direction for conveyance, a statement in writing from Niles Center State Bank to the effect that the entire purchase price of all of the lots so directed to be conveyed (less 17% of the contract price) has been received by it, whereupon such deeds shall be delivered by first party to second parties or upon their order, or

"2.  Said second parties shall present request, in writing, from said Niles Center State Bank for the delivery to it of such deeds so directed to be executed by parties of the second part, which request shall contain the statement by said bank that it will, before delivery of the said deed or deeds, collect the balance of such purchase price due under such contracts; which certificate or written statement of the said Niles Center State Bank shall be binding and conclusive upon the beneficiary or beneficiaries hereunder, and

the party of the first part shall be fully authorized to act thereon, and shall execute and deliver deeds as directed to the parties of the second part, if the certificate of said Bank shows the amount due on said contracts to be paid in full, or to deliver said deeds to said Bank, if the written statement is to the effect that they will collect the balance due upon said contracts before the delivery of said deeds.

"ARTICLE VI.

"Section 1. Whenever during the life of this contract, contracts for the sale of portion of said premises and providing for an aggregate gross sales price for the property so sold of Two Hundred Seventy-one Thousand and Eighty-four Dollars (less any amounts paid over to Niles Center State Bank from proceeds of collection of contracts deposited as First Deposit or Second Deposit) shall have been deposited by parties of the second part with party of the first part, and parties of the second part shall also deposit with party of the first part,

"(a)   A certificate of Niles Center State Bank to the effect that it has received from second parties all amounts due on said contracts to that date, as shown by the sworn statement of parties of the second part.

"(b)   An affidavit by parties of second part that all the contracts represent sales to bona fide purchasers; that there is actually due upon said contracts, together with cash already received and accounted for, the aggregate amount of $271,084.00, and that there are no liens or charges whatever against said contracts.

"Then said second parties shall succeed to and become the owners of the beneficial ownership in said trust without any direction from said beneficiary, in so far as it relates to the remaining real estate not sold under contracts so deposited with party of the first part, which happening shall be designated 'Change of

Beneficiary,' and said second parties shall thereafter have the same right of disposition over any of said real estate remaining in said trust and proceeds thereof and not contracted to be sold under said contracts held by party of the first part, as the previous beneficiary would have had if no transfer of the interest of such beneficiary had taken place.

"Section 2.   Upon the second parties becoming the owners of the beneficial interest in the balance of said real estate as provided in preceding section, the party of the first part shall turn over or cause to be turned over to said previous beneficiary all contracts and proceeds on deposit with party of first part upon delivery to first party by said beneficiary of contracts and all assignments thereof comprised is said First and Second Deposits, except contracts to be selected by beneficiary from the contracts comprising said First Deposit or from said First and Second Deposits as the case may be upon which there shall remain a balance of Fifty Thousand Dollars on purchase price, which contracts so retained shall be designated as the Third Deposit, and which shall be retained by said beneficiary under provisions of succeeding section hereof.   The original beneficiary shall have the sole right to control and direct conveyances as to that portion of the real estate in said trust covered by contracts delivered to said original beneficiary at the time of change of beneficiaries, with full control over the portion of said trust relating thereto.

"Section 3.   The parties of the second part shall be obligated to resell any lot or tract upon which contract held by beneficiary shall be forfeited at not less than amount of sale price in contract so forfeited.   In the event of failure of party of second part to resell said lot or lots within ninety days after written notice to second party of such forfeiture, then the beneficiary shall at his option have the right to select from the con-

tracts comprising said Third Deposit a contract or contracts with the same amount due thereon that was due upon said forfeited contract or contracts at the time of forfeiture after adding to the amount of such forfeited contracts all costs, expenses and attorneys' fees, incurred by beneficiary in connection with such forfeiture. Upon beneficiary exercising such option he shall give to parties of the second part written notice thereof, specifying contract or contracts so forfeited, the contracts selected in place thereof, and shall also furnish proper written direction to party of the first part to thereafter hold the title to said lots or tracts covered by said forfeited contracts subject to control or direction of said second parties.

"The regular monthly payments upon the contract in said Third Deposit may be retained by parties of second part, provided that the amount of such Third Deposit shall at all times be maintained at Fifty Thousand Dollars in net value of contracts, less the reduction caused by said regular payments made when due and not in advance.

"The parties of the second part shall make monthly statements in form heretofore provided showing collection upon said contracts included in said Third Deposit.

"The parties of the second part shall after 'Change of Beneficiary' continue to make collection upon the contracts turned over to previous beneficiary and account therefor to said bank without charge, unless said beneficiary shall direct the payments to be paid to some other party.

"Such Third Deposit shall be held by said beneficiary for the period of thirty months after the Change of Beneficiary, and any contracts remaining in said deposit, after said period, shall be by the beneficiary returned to parties of the second part, together with any assignments thereof.

## "ARTICLE VII.

"This contract shall not be construed as creating a partnership, and shall not be placed of record. Time is of the essence of this contract and of all provisions hereof, and this contract shall be binding upon and inure to the benefit of the heirs, administrator and assigns and successors of parties hereto and of said beneficiary.

## "ARTICLE VIII.

"The parties of the second part shall be authorized to place upon said premises a wooden building to be used as a sale office, which building shall be considered personal property and shall remain the property of said second party, and may be removed from said premises at any time within ten days after termination of this contract.

## "ARTICLE IX.

"Any notice provided for herein shall be made on said Michael Baumann by leaving same at Niles Center State Bank and on parties of second part at their offices, 77 West Washington Street, Chicago, Illinois, and except as herein provided shall be given at least three days before taking effect of same.

## "ARTICLE X.

"The beneficiary shall have the right to retain possession of the two houses located upon said premises for one year after date hereof.

## "ARTICLE XI.

"The term 'beneficiary' as used in this contract shall refer to Michael Baumann, the present beneficiary under said trust, or to any beneficiary or beneficiaries under said trust succeeding to his rights there-

under but not to second parties after change of beneficiaries.

## "ARTICLE XII.

"The intent hereof is that said beneficiary shall realize from the contracts ultimately turned over to him the net principal amount of Two Hundred Twenty-five Thousand Dollars, and therefore all costs of survey, subdivision, platting, fees of trustee, fees for collection, costs and expenses in connection with forfeiture of contracts, expenses of putting said real estate in shape for sale, and in connection with sale thereof, and for improvements placed upon said premises except such as shall be paid for by special assessment, shall be paid and discharged by second parties.

"Whenever parties of the second part shall be required to have sidewalks installed upon said premises, they shall first deposit with said Niles Center State Bank an amount sufficient to pay for the construction of said sidewalks before any contract be let therefor.

"IN WITNESS WHEREOF the said parties have hereunto set their hands and seals the day and year first above written.

"Standard Trust & Savings Bank,
  as Trustee for the Lincoln-Main
  Gross Point Realty Trust.

"By H. H. Hawkins,
 "A. Secretary.
"A. A. Lewis Realty Association,
 "By A. A. Lewis,
 "Melvena Wilson.

"I, the undersigned, beneficiary in the above mentioned, hereby direct Standard Trust & Savings Bank, as Trustee under Trust No. 1127 to execute the above agreement.

  "Michael Baumann (Seal)"

While certain defendants argue that this agreement constituted a sale of the property to Lewis and Wilson, they are unwilling to rest their case upon that interpretation. Indeed, counsel for Baumann, in an effort to avoid the plain effect of the contract, give it various interpretations, viz., (1) that if Baumann, by the agreement, employed Lewis and Wilson it was a special agency and not a general agency; (2) that by the agreement Baumann employed Lewis and Wilson as independent contractors; (3) that the Standard Trust and Savings Bank, Trustee under Trust No. 1127, alone employed Lewis and Wilson; (4) that "Baumann's position is like the vendor of real estate who takes back a purchase money mortgage"; (5) that Baumann cannot be held responsible, because Lewis and Wilson, co-partners, were doing business under the name and style of Lincoln-Main & Gross Point Realty Trust and as such were legally able to act as vendors, citing *Weissbrodt v. Elmore & Co.*, 262 Ill. App. 1, 3, and *Beilin v. Krenn & Dato, supra.* We need notice the last point only. Each of the cases cited in support thereof holds that the contract before the court was not void for want of a vendor. The same is true of the instant contracts. But here the proof, including the contracts, shows that Lewis and Wilson were sales agents for Baumann, the real owner of the property, and the Standard Trust and Savings Bank, as trustee. Baumann is not released under the contracts merely because the selling agents, under the facts and circumstances, are also liable to complainant. The lawyers who drafted the agreement deemed it necessary to provide therein that it "shall not be construed as creating a partnership." Counsel for Lewis and Wilson and the Foreman-State Trust and Savings Bank, trustee, do not contend that this agreement, in itself, constituted a sale. They argue that by the agreement made between Baumann; Melvena Wilson;

Standard Trust & Savings Bank, trustee under Trust No. 1127; State Bank of Chicago, trustee under its Trust No. 2736 and Trust No. 1127; and Niles Center State Bank, on February 12, 1927, Baumann parted with his beneficial interest in Trust No. 1127 and Melvena Wilson acquired it, and that thereby the acquired beneficial interest "related back to the time of the trust agreement [March 30, 1925] and actually made the sale from Baumann to Lewis and Wilson as of that date." In other words, to save Baumann and the banks from paying back to complainant the moneys he paid under his contracts, Lewis and Wilson are willing to concede that by the doctrine of relation they became the absolute owners of the property on March 30, 1925, although that doctrine has no application to the facts of the instant case. The agreement of February 12, 1927, recites that the copartnership between Lewis and Wilson had been dissolved and that they had theretofore assigned all of their right, title and interest in and to the trust agreement of March 30, 1925 (known as Trust No. 1127), to the State Bank of Chicago under its Trust No. 2736. It also recites that the provisions contained in Article II of the contract of March 30, 1925, had been fully complied with and that the State Bank of Chicago, Trustee, was entitled to beneficially succeed to and become the owner of the beneficial interest in Trust No. 1127, *"in so far as said trust relates to the remaining lots in said subdivision not sold."* The real purpose of the agreement of February 12, 1927, is obvious. It is difficult to avoid the impression that the plan of certain defendants contemplated protecting, if possible, the financially responsible defendants. The record shows that Karambelas and Kaplan are "financially embarrassed," and Lewis testified that in April, 1932, he "turned over all of his assets to his creditors." As counsel for complainant states, "If Baumann and the Standard Trust and Savings Bank and

Lewis and Wilson intended by the agreement of March 30, 1925, to make it an instrument of sale to Lewis and Wilson they took extraordinary pains to avoid saying so in that document.'' The contention that this agreement constituted a sale to Lewis and Wilson and that they were the vendors in the Bundesen contracts is sufficiently answered by its numerous provisions and conditions. Indeed, the parties themselves never considered it a sales contract. Lewis testified before the Department of Education and Registration on April 11, 1930, that they ''contracted to sell the property, to subdivide it, didn't buy it, directly. I negotiated to get a contract to sell the property; we didn't buy the property.'' Before the master in the instant proceeding Lewis testified that Lewis and Wilson ''were the sales agents for Mr. Baumann''; that it was true that ''we didn't buy the property''; that ''the authority we had to act as selling agents'' was the agreement of March 30, 1925. In Baumann's answer he states ''that while the said A. A. Lewis Realty Association was, at the time alleged in the first paragraph of said third amended bill of complaint, engaged in buying and selling real estate, and while said Association had certain rights of sale of certain property belonging to this defendant, yet the said A. A. Lewis Realty Association, the members of which were, so far as this defendant knows, A. A. Lewis and Melvena Wilson, were neither authorized, directed or permitted, nor were they allowed, with the knowledge or consent of this defendant, to make any representations in regard to said real estate which were not strictly and absolutely true''; that if any false representations were made to complainant they were made without his knowledge or consent. The answer denies the right of complainant to cancel all or any part of the contracts in question, ''and alleges the fact to be that it is impossible for the complainant to put this defendant in the same position

which he was before the execution of the said contracts and the payment of said moneys as alleged in said bill of complaint.'' The agreement of March 30, 1925, provides that the copartnership may ''enter into and execute contracts for the sale of said real estate . . . in the name and behalf of Lincoln-Main-Gross Point Realty Trust.'' In complainant's contracts appears the following: ''And the second party . . . agrees: . . . To pay to A. A. Lewis Realty Association, *Manager of Lincoln, Main and Gross Point Realty Trust.*'' The contracts were signed on behalf of the party of the first part as follows:

> ''Lincoln Main & Gross Point Realty Trust, of which Standard Trust & Savings Bank is Trustee.
> ''A. A. Lewis Realty Association, *Manager.*
> ''First Party.
> ''By A. A. Lewis.''

The agreement of March 30 also provides that Lewis and Wilson shall deliver to the party of the first part ''a copy of all contracts . . . and also all original contracts received by them and belonging to the Trust Estate,'' so that the bank and Baumann had full notice as to how Lewis and Wilson held themselves out to the public, and the bank and Baumann received payments under the contracts so executed. We have considered the agreement of February 12, 1927, which the defendants call a ''change of beneficiary'' agreement, and in our opinion it does not change the agreement of March 30, at least so far as complainant is concerned. The agreement of February 12, 1927, provides that a change of beneficiary shall operate only on the *''remaining lots in said subdivision not sold under the contracts.''* That agreement, made long after the execution of the contracts with complainant, could not

affect complainant's rights. Indeed, it purports to apply only to the lots not sold, and it affirmatively shows that the lots covered by complainant's contracts had been sold. Complainant was still making payments on his contracts when the agreement of February 12, 1927, was signed. It would appear from that agreement and the two lists attached to it that all of the thirteen contracts signed by complainant are still in·the possession of Baumann. The latter admits, in his answer, receiving payments made by complainant upon the same. We hold that complainant is entitled to a decree against defendant Baumann.

In re liability of Standard Trust and Savings Bank, merged with National Bank of the Republic: This defendant, as Trustee under Trust No. 1127, at the written direction of Baumann, defendant, the sole beneficiary under the said trust, entered into the contract of March 30, 1925, with Lewis and Wilson, defendants, by the terms of which the latter were made the general agents of Standard Trust and Savings Bank, Trustee, for the sale of the property, and the bank, as well as Baumann, is liable to complainant for the acts of Lewis and Wilson, and complainant is entitled to an accounting against it.

In re liability of State Bank of Chicago, its successor, Foreman-State Trust and Savings Bank, and the receiver of the latter institution: This defendant must account to complainant for moneys paid by him on account of the contracts, and which it admits having received. Its liability will be limited to the amount it held at the time it had notice of the pendency of the instant cause.

In re claim of Jacob Schwartz, defendant and cross appellant: Jacob Schwartz, defendant, filed an answer to the bill admitting all of the allegations contained therein and alleging the purchase by him of one-half of the Karambelas interest in the contracts, aver-

ring that the purchase was induced by the same fraudulent means and representations that induced complainant to enter into the contracts, and asking the same relief as complainant prayed for in the bill. Schwartz also filed a cross-bill asking relief. He testified that in February, 1926, Karambelas came to him and stated that he wanted to sell to him one-half of his interest in the contracts for $2,825; that he was in arrears to the extent of $1,000 and would have to have that amount immediately, as he could not obtain consent to the assignments of the contracts until the payments were brought up to date; that the same representations and instrumentalities were used to induce him to purchase the said interest as were used to induce complainant to enter into the contracts. Schwartz also testified that he believed the representations made by Karambelas to be true and relied upon them; that he did not learn they were false until 1929; that he did not learn that commissions had been paid to Kaplan and Karambelas until the latter testified in the instant cause; that on February 9, 1926, he paid Karambelas the sum of $1,000 and entered into a contract for the purchase by him of one-half of Karambelas' interest in the contracts, for $2,825; that on February 25, 1926, he paid to Karambelas the balance of the purchase price, $1,825, and received from him 13 assignments, one for each contract; that Melvena Wilson, by Harry C. Kinne, her attorney, consented to the assignments. Schwartz contends that under the facts there should be a rescission or cancellation of the contracts and a return to him of the moneys he paid upon them. In addition to asking for a decree against Karambelas, Schwartz contends that all of the other defendants, through their acts of omission and commission, made it possible for him to be defrauded by Karambelas and that he is also entitled to a decree against them. That Schwartz is entitled to a decree

against Karambelas is not seriously disputed in any of the briefs filed. But we cannot agree with his contention that he is entitled to a decree against the other defendants. His dealings with Karambelas occurred about 13 months after the execution of the original contracts and his testimony shows that he had no dealings with any of the defendants save Karambelas, that he relied upon the representations made to him by Karambelas, and that he purchased the assignments from the latter. Karambelas, in his dealings with Schwartz, was acting for himself, alone, and he sold to Schwartz nothing but a part of his own interest in the contracts. Other good reasons why Schwartz is not entitled to a decree against the other defendants might be stated if it were necessary. Schwartz is entitled to a decree against Karambelas.

The decree of the superior court of Cook county is reversed, and the cause is remanded with directions to the trial court to enter a decree in accordance with the views expressed in this opinion.

*Decree reversed and cause remanded with directions.*

John J. Sullivan, P. J., and Friend, J., concur.