HUGO J. HAKALA *et al.*, Plaintiffs-Appellants, *v.* ILLINOIS DODGE CITY CORPORATION, Defendant-Appellee.

Second District   No. 77-68

Opinion filed September 15, 1978.

Lloyd J. Tyler and John N. Dore, both of Tyler, Peskind & Solomon, of Aurora, for appellants.

David T. Fritts and Tomas M. Magdich, both of Keller & Magdich, of Dixon, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The plaintiffs appeal from the judgment of the trial court of Boone County in favor of the defendant in an action brought to rescind a transaction whereby the plaintiffs paid to the defendant the sum of $75,360 in return for the conveyance of some 8.54 acres of land. The land in question was part of a larger tract owned by the defendant, Illinois Dodge City Corporation, and was located in Boone County, north of the Northwest Tollway, near Belvidere.

The tract which is the subject of this litigation had no access and it was provided in the original purchase agreement between the defendant and the original purchaser, Bette Lee Pyfer, that in addition to furnishing certain sanitary facilities to the property, the seller would provide access, as indicated by paragraph 8 of the contract to purchase, which reads as follows:

"8. Seller shall furnish, at its expense, a sixty (60) foot improved

roadway from the North West corner of the above described premises and running thence Westerly along the North line of Ka-Ner, to the road commonly known as the 'Service Road'. * * *"

In 1966, the present plaintiffs bought Betty Lee Pyfer's rights under the contract and took an assignment of all of her rights thereunder, including the obligation of the defendant, stated in paragraph 8, to build the access road. In May 1968, in the course of completing the purchase of the property, the plaintiffs were furnished a title report from the McHenry County Title Company which indicated the land in question had no access. Therefore, an escrow was set up in the amount of $41,300 out of the purchase price of $75,360, to be released to the seller upon the seller furnishing city water and sanitary facilities to the property and completing "construction of East Chrysler Drive and Dodge Terrace, in accordance with the requirements of the City of Belvidere * * *," the city engineer being appointed agent for all parties "to determine the nature and extent of the performance by SELLER" in accordance with paragraph 8 of the agreement of October 15, 1965, between seller and Betty Lee Pyfer.

There is no indication as to whether the city engineer ever gave the escrowee a written certificate of acceptance. However, the road was built and on October 24, 1968, John Strom, the seller's attorney, wrote the plaintiff, John G. Boyle, as follows:

"I was successful in completing the Dedication of East Chrysler Drive and Dodge Terrace and have just received the acceptance back from the City. As soon as sufficient prints are made of it, I will have it recorded.

To my mind this is the last remaining item to be done as far as our Escrow Agreement is concerned. You probably know that the City does not wish us to proceed with black topping until next Spring."

This was followed by another letter from Strom to Boyle, dated November 14, 1968, reading as follows:

"I am enclosing now the recorded Plat of the Dedication of East Chrysler Drive and Dodge Terrace, which was accepted by the City of Belvidere on October 7, 1968.

Such being the case, I believe this now completes all of the conditions of the Escrow. Consequently, I would like your permission to release the balance of the funds as the contractor is growing impatient for the balance of the monies involved."

To which Boyle replied:

"Enclosed find a direction from Hugo Hakala to turn over the street escrow fund, which was deposited pursuant to the agreement of May 9, 1968. [The escrow agreement.]

It is my recollection that you assured me that all requirements

relating to the construction of the roads in question have been fully carried out."

(The plat of dedication referred to is an exhibit in this case showing its acceptance by the City of Belvidere as of October 4, 1968.)

Upon receipt of the direction referred to, it was used by defendant, in late 1968, to obtain release of the escrow funds. John G. Boyle testified at the trial that at that time he went out and drove over the new road but did not know until 1972 that the eastern terminus of the road did not reach his property.

In October of 1969, at the direction of the defendant, a surveyor prepared a plat of survey which showed that the access road in question ended at a point some 38 feet short of the plaintiffs' property. However, this document was not certified for record until September 1972, which is the time the plaintiffs say they first became aware of the discrepancy. It is apparent that neither the plaintiffs nor the defendant were aware of the gap in the road at the time it was completed and the escrow funds released. However, about September 15, 1972, when the 1969 survey was certified by the surveyor, the remaining property of the defendant was sold to a third party, including the land representing the gap between the access road and the plaintiffs' property, thereby making it impossible for the defendant to convey the land necessary to complete the road, and irretrievably landlocking the plaintiffs' property.

The plaintiffs claim that they did not discover that the end of the access road did not reach their property until October 1972. Shortly after that they began trying to negotiate a settlement whereby the defendant would convey additional land to them to complete the access road. However, they then discovered it was too late for the defendant to do so since, as noted above, the defendant had shortly before that conveyed the last of its land, including the land needed to close the gap, to third parties. In December 1972, Boyle wrote to Ives, the secretary of Illinois Dodge City Corporation, to demand that the defendant do something to rectify the situation. Boyle testified he made 16 telephone calls to Attorney Strom and to Ives and Anderson (another officer of Illinois Dodge City Corporation) between April and December of 1973, attempting to reach a solution to the problems created by the landlocking of the property. That the defendant was aware that it had an obligation to relieve the situation by some means or other is clear from correspondence between Attorney Strom and Ives and between Attorney Strom and Attorney Schiller (who represented the people who had recently acquired Illinois Dodge City's remaining land). On December 7, 1973, Strom wrote to Ives as follows, sending a copy to Boyle:

"I was quite successful in my negotiations with Mr. Schiller. We have reached agreement as follows:

Illinois Dodge City Corporation, upon receiving the deed for a

tract of land approximately 60 feet wide and 500 feet in length will extend Dodge Terrace easterly to a point on the extreme east line of the premises conveyed to Hugo Hakala."

Following up that letter, another letter was written on July 9, 1974, by Strom to Schiller, reading as follows:

"Pursuant to our meeting in your office in December, herewith follows the legal description (obtained from the Title Company) which is the extension of Dodge Terrace as now laid out Easterly to the most Westerly extension line of Hugo Hakala—John Boyle property that we agreed would be completed by my client upon your furnishing the required access.

I am hopeful that you can see to the execution of a proper deed so that we may complete our negotiations with Messrs. Hakala and Boyle."

On August 21, Attorney Strom followed this up with another letter to Attorney Schiller, as follows:

"In referring to my file, I note that I wrote you a two page letter in detail on July 9th and did not receive a reply from you.

My client is quite anxious to conclude this, pursuant to our previous meetings in your office and our agreements reached at that time. I would appreciate your forwarding me the deed 'post haste.' Otherwise, I am afraid a law suit might likely result against both of our clients."

While the correspondence set out above indicates an agreement was imminent between Strom and Schiller whereby the land needed to complete the road might be obtained, nothing was consummated. Boyle testified he had a direct conversation with Anderson of Illinois Dodge City Corporation, calling his attention to the lack of response to his various communications. Finally, on January 15, 1975, the plaintiffs filed suit for rescission of the transaction and tendered back the deed they had received from Illinois Dodge City Corporation, plus $4,000 they had received from the State of Illinois for a 20-foot strip of land they had sold to the State for highway purposes, under threat of condemnation.

Mention should perhaps be made at this point of the transaction whereby the plaintiffs sold the 20-foot strip of the land they had acquired from the defendant to the State for purposes of erecting a toll booth on the tollway, since it involves a point raised in this appeal. At about the same time that the plaintiffs and defendant here were negotiating for the sale of the tract of land in question (April 1968), a representative of the State of Illinois approached the defendant with reference to acquiring a strip of the defendant's property along its southern border (adjacent to the northern border of the Northwest Tollway). In a letter dated April 30, 1968, Mr. Ives of Illinois Dodge City Corporation referred the State's representative to Mr. Boyle for the purchase of the strip along the

southern boundary of the property the defendant was in the process of selling to Boyle and Hakala. At the same time, Illinois Dodge City Corporation sold an adjoining strip of land to the Tollway Commission. Attorney Boyle testified that the State first approached him in May of 1968 with an offer of $3,000 to buy the 20-foot strip it desired and threatened a "quick take" condemnation if he would not sell the land at that price. Eventually he sold the land to the Tollway Commission for $4,000. This was the amount of cash tendered to the defendant, together with the deed to the rest of the property when the plaintiffs, in January 1975, sued for rescission of the contract whereby they had acquired the tract in question.

At the trial, the defendant contended, as it does in this appeal, that the agreement to provide the access road was merged in the escrow agreement and was extinguished by the release of the escrow; that the plaintiffs were guilty of laches which prevented their recovery in an equitable action, such as rescission, and that the plaintiffs were estopped to sue for rescission because by selling off part of the land they acquired from the defendant, they made it impossible for them to restore the status quo, therefore, under the rule pertaining to the doctrine of rescission, they could not recover.

After a trial on the merits, the trial court found that there had been a mutual mistake; that the agreement to build the access road was merged and lost in the escrow agreement, and that the plaintiffs were guilty of laches. The court, accordingly, gave judgment for the defendant.

■■ In this appeal, the plaintiffs contend the trial court erred in finding that there had been a mutual mistake, since the mistake in not completing the road to the plaintiffs' boundary was obviously a unilateral mistake of the defendant alone. However, since we agree with the plaintiffs that even if there had been a mutual mistake this would not be a bar to a suit for rescission, but on the contrary, a mutual mistake is of itself *grounds* for a rescission of a contract, we disregard this point. See *Hoops v. Fitzgerald* (1903), 204 Ill. 325; *Boyd v. Aetna Life Insurance Co.* (1941), 310 Ill. App. 547; *Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449.

The more significant points raised by the plaintiffs in this appeal are (1) that the court erred in finding that the impossibility of restoring the status quo was a bar to rescission; (2) that the court erred in finding that there was a merger of the original contract into the escrow agreement, thereby substituting the escrow agreement for the original and, in effect, releasing the conditions of the original contract with the escrow funds; (3) that the court erred in finding the plaintiffs guilty of laches, and (4) the court erroneously considered as "additional evidence" its own view of the property instead of confining its view to the observable physical facts, without comment as to evidence.

■■ ■ We consider first the question as to whether the failure to restore the status quo bars an action for rescission. While it is a general principle of the doctrine of rescission that a person demanding rescission restore the other party to the status quo existing at the time the contract was made, rescission is an equitable doctrine and as stated in 77 Am. Jur. 2d *Vendor and Purchaser* §565 (1975):

> "As in other cases of rescission, the vendee is ordinarily required to restore the status quo, insofar as he has received any benefit, as a condition of his right to rescind; but he is not required to put the other party in the same situation in which he was before the contract, where the latter has rendered it impossible· by the nature of his fraud or other act, or where from the nature of the land and the purpose for which it was purchased, it is impossible to restore the status quo, as where the purchase was of timberland and the purchaser had cut timber thereon; in such a case all that the purchaser can be required to do is to reimburse the vendor for the value of the timber removed.* * *"

In this case, no timber was removed but a strip of land was removed since it was required by the State and it is obvious that it would have been taken under condemnation procedure, if there had been resistance. The principle above referred to is clearly not intended to apply to such situations. See *Bundesen v. Lewis* (1937), 291 Ill. App. 83, where a similarly technical defense to a suit for rescission was made on the ground that after the conveyance an old farm house on the property was wrecked thus precluding the possibility of restoring the status quo. The court refused to recognize this as grounds for denying rescission, since the defendant was in no way harmed. The technical objection raised here is on the same footing. The sale to the State was not voluntary and there is no reason at all to suppose that the defendant would not have sold the strip in question to the State if it had owned it and a "quick take" condemnation was threatened, as Boyle testified was the case. That the defendant would have done the same as Boyle did is obvious from the fact that it did sell the State its own 20-foot strip at the same time. Indeed, as was brought out by one of the exhibits, the State first approached the Illinois Dodge City Corporation to buy the land in question and it was the corporation who referred the State's representative to Boyle for the purchase of the strip of land required from the plaintiffs. The frivolity of this defense is very obvious when we consider that the defendant within a short time afterward sold *all* of its land to third parties, thus it clearly did not want the land, it wanted the money it represented. While the defendant points out that no condemnation suit was filed against Boyle and Hakala neither was any condemnation suit filed against it, when it sold the land. Moreover, it later voluntarily conveyed all of the remaining

land for a money consideration. Since it is fair to assume that the corporation would also have sold the 20-foot strip in question then owned by the plaintiffs, if it had had it at the time the State approached it, and since the plaintiffs have offered to give the corporation credit for the purchase price in the amount of $4,000, which they received for that strip from the State, we fail to see how the corporation is in any way harmed by the plaintiffs' present inability to reconvey the small strip in question. We think the offer to credit the money received from the State is sufficient to do equity under the circumstances.

In his memorandum opinion giving judgment in the defendant's favor, the trial court stated "[t]hat the Court deems a merger of all prior contracts, deeds and agreements to have taken effect upon the release of the escrow funds herein."

██ We think this statement by the trial court denotes a misconception of the nature of an escrow agreement. An escrow document is in no way a substitution for the original contract but is merely an auxiliary instrument created to help implement or execute the primary agreement. As was said by Corbin (Corbin on Contracts §249 (1952)):

> "The ordinary function of an escrow or of a conditional delivery of a document is to give security to both parties to an *existing transaction*." (Emphasis added.)

If, indeed, the purpose of an escrow agreement is merely to give security to both parties for the performance of an *existing transaction*, it is clear that the escrow agreement does not supercede the original contract or "merge" the original contract into it, but is merely a security device to implement the execution of the main contract. Again, Corbin says:

> "The vitally important and operative fact is not a second delivery of the document, whether a conveyance or a contract; it is *the fulfillment of the condition*." (Emphasis added.) Corbin on Contracts §249 (1952).

Thus, in the case we consider here the vitally important fact was the completion of the road as indicated by the city engineer's acceptance. This was merely the trigger for the release of the funds—the escrow agreement in no way modified this condition, it merely set the time and circumstances under which the money would be released. In effect what the defendant is arguing here is that the important thing was not the completion of the road, but the release of the funds in the belief that it had been completed. Certainly the escrowee was justified in releasing the funds after it was instructed to do so by Hakala. But to argue that the release of the funds negated the original conditions the escrow was intended to protect, is to honor the form while disregarding the substance, contrary to equitable principles.

Again, in 28 Am. Jur. 2d *Escrow* §1 (1966), we find the following:

"The instructions by the parties to the depositary concerning the delivery and taking effect of the escrow instrument constitute what the law denominates the 'escrow agreement,' which *is a different thing from the instrument placed in escrow."* (Emphasis added.)

■■ Thus we see that the contract itself, whose existence is necessary before the escrow agreement comes into being, is entirely separate and independent of the escrow agreement and it is not the law that an escrow agreement "merges" the original contract with the escrow agreement it is designed to implement, into such escrow agreement. Indeed, it is interesting to note that the defendant itself does not in its brief refer specifically to the doctrine of merger indicated in the court's memorandum opinion. In any event, we find it has no application to the situation we consider here. See *Trapp v. Gordon* (1937), 366 Ill. 102, 110:

"While it is the general rule that all prior verbal understandings or agreements with reference to the subject matter become merged in a deed upon its acceptance and the deed constitutes the only contract between the parties which binds them [citations] yet this rule, like many other rules in the field of law, is subject to exceptions and qualifications. Where the contract provides for other acts besides the conveyance, the contract remains in force after the delivery of the deed until it has been fully performed. [Citations.]"

Here the agreement to build the access road was not superceded by the escrow agreement, rather that agreement was merely an adjunct which sought to guarantee the performance of the agreement. The principle of merger has no application to the facts before us, because there was no actual performance of the condition for which the escrow was set up.

As to the defense of laches raised by the defendant and accepted as a valid defense by the trial court, we see no basis for it in the record before us. It is true, of course, that if the plaintiffs had, following the supposed completion of the road, been suspicious enough of the defendant's good faith to have ordered a survey of their own to establish that the new road not only was properly engineered but also was extended to their northwest boundary, they would have at that time discovered the mistake. However, we think there were factors here which militated against their exercising such vigilance. In the first place, their respective attorneys were well acquainted, both having practiced in the area for many years and it is obvious from Boyle's letter to Strom of February 12, 1969, stating, "It is my recollection that you assured me that all requirements relating to the construction of the roads in question have been fully carried out," there was reliance on a personal relationship as a basis for believing that the escrow funds could be safely released.

Moreover, as testified by Boyle, he has been referred by Mr. Ives,

secretary of Illinois Dodge City Corporation, to Mr. Anderson, a surveyor, as the person having a sketch which, according to Boyle's testimony, purported to show "the property Mr. Hakala and I were proposing to purchase and would show the relationship to the other properties in the development." A sketch for sales purposes and a blue print were introduced into evidence during Boyle's testimony. The blue print shows a dotted line above which is printed "access road" which apparently runs between the proposed extension of Chrysler Drive and the northwest corner of the Hakala-Boyle tract. While this was not an actual survey it indicated clearly, together with the advertising sketch, that the proposed road would run to the plaintiffs' property, which was in accordance with the original contract agreement between the defendant and Bette Lee Pyfer, plaintiffs' assignor. The existence of paragraph 8 calling for the building of an access road was, of course, an acknowledgement by all parties that the property had no access otherwise, so that the necessity of an access road was clearly a paramount consideration from the beginning and nothing that the defendant needed notice of. Under these circumstances when Attorney Strom advised Attorney Boyle that "all requirements relating to the construction of the road had been carried out," and sent Boyle a copy of the dedication and acceptance by the City of Belvidere of the new road, as prepared by a registered surveyor, it is hardly fair to charge Boyle with negligence in complying with Strom's request to release the escrow.

While it appears that Boyle gave consent to the release of the escrow funds without an actual certification from the city engineer of Belvidere as to the defendant's performance of the convenants of the escrow agreement, this had no bearing on the mistake which was made in the length of the road. It was not, of course, intended by the parties that the city engineer would certify as to the location or the terminus of the proposed road, but only as to the engineering specifications thereof. He was not a surveyor and his certification would not have avoided the error which was made here. Reference to the highly technical description of the location of the road in the survey made by the surveyor, Carlson, in his survey, makes it clear that the mistake which occurred was not within the city engineer's orbit. The error which occurred in failing to bring this road up to the boundary of the plaintiffs' property was an unusual one, not normally to be expected and provided for by an escrow agreement and certainly not one likely to be caught by the city engineer, who would naturally rely on the surveyor for the location and length of the road. We think the defendant's point as to the failure of the plaintiffs to insist on the city engineer's certification before releasing the funds, therefore, is in the first place an inequitable argument in view of Attorney Strom's personal assurances to Boyle that the requirements of the escrow agreement had

been complied with, and in the second place, a pointless argument because the error which occurred and which caused the damage was one entirely beyond the sphere of the city engineer and the intent of the parties as to his responsibility.

Thus it is clear that the plaintiffs had reason to rely on the defendant's representation that the escrow agreement had been complied with as to the building of the road and we think that until they had actual notice to the contrary, by inspecting the survey made by Carlson in 1969, but not registered until October of 1972, laches could not begin to be charged against them, granting that laches could ever be charged against them by the persons who initiated the error in the first place.

■■ In any event, we see no conduct amounting to laches under the circumstances of this case. The maxim of equity invoked here is that equity will not aid a person who sleeps on his rights. It is necessary to know that a wrong has been done or a mistake made before one can "sleep" on his right to have that wrong requited or the error corrected. In this case, the survey made by the surveyor, Carlson, in 1969, was not certified of record as a public document until October of 1972, shortly after the September 15, 1972, sale of the last remaining land of the defendant to third parties, which landlocked the plaintiffs. The record shows ample evidence of active, zealous and continuous efforts by Attorney Boyle from October 1972 to a few days before suit was filed in January 1975, to protect the plaintiffs' rights and arrive at a satisfactory settlement of the difficulty. The plaintiffs certainly cannot be accused of sleeping on their rights from October 1972 to the date of the suit. It would be necessary for the defendant to establish that irretrievable laches occurred between February 1969, when the escrow was released, and October 1972, when Boyle advised the defendant that the gap in the road had been discovered. Bearing in mind that the defendant was in possession of the survey showing this gap and that it sold the intervening land to another party, while they had the survey in their possession, they can hardly be heard to complain that the plaintiffs' failure to discover and complain about the error caused them to alter their position. The defendant was at least as negligent as the plaintiffs and we see no basis for invoking the equitable doctrine of laches against the plaintiffs during this period.

Moreover, laches as a defense is not generally available where the defendant acknowledges the injury and advises the complainant he is taking steps to remedy it. In this case, aside from telephone conversations relative to rectifying the situation, testified to by Boyle, during the years 1973 and 1974, there is a letter dated December 7, 1973, to Mr. Ives, from Attorney Strom, copy of which was sent to Mr. Boyle, with a footnote from Strom, and copies of letters dated July 9, 1974, and August 21, 1974,

following up the December 7, 1973, letter from Strom to Attorney Schiller, all referring to negotiations which were underway for the purchase of a strip of the land acquired in 1972 by Schiller's clients from the defendant, which could be used to provide access to the plaintiffs' land. It is significant that the letter of August 21, 1974, from Strom to Schiller concludes, "I would appreciate your forwarding me the deed [for the access strip] 'post haste'. Otherwise, I am afraid a law suit might likely result against both of our clients." Copies of these letters having been sent to Boyle, he was thereby informed that the defendant acknowledged its obligation to rectify the situation and the sentence, "[o]therwise, I am afraid a law suit might likely result against both of our clients," is certainly an indication that the plaintiffs were holding off filing their suit pending the settlement discussed in Strom's letter.

Viewing the whole series of events and bearing in mind that the defendant had a survey in its possession showing the plaintiffs' landlocked position at the time they sold the intervening strip of land to third parties, we see no basis for the defense of laches, based either on the passage of time or an alteration in the defendant's position.

We find it unnecessary to consider the contention of the plaintiffs that the trial court erred in considering certain facts gleaned from his view of the property, as additional evidence. If facts derived from a viewing by the court were, indeed, considered as evidence, this was improper (see *Lancer Industries, Inc. v. City of Aurora* (1975), 30 Ill. App. 3d 962, and cases cited therein). However, we deem it immaterial in view of our holding on the other issues raised in this appeal.

The judgment of the circuit court of Boone County is reversed and the cause is remanded to the trial court with instructions to grant plaintiffs' prayer for rescission by ordering defendant to repay to plaintiffs the sum of $71,360 ($75,360 less the $4,000 received from the State) and further ordering plaintiffs to convey to defendant the property in question, less the south 20 feet which was heretofore conveyed to the State of Illinois.

Reversed and remanded with directions.

BOYLE and WOODWARD, JJ., concur.