**EASTERN MOTOR INNS, INC.**

v.

**Armand RICCI and Shirley Ricci.**

**No. 88–509–Appeal.**

Supreme Court of Rhode Island.

Nov. 20, 1989.

Lauren E. Jones, Jones & Aisenberg, Joseph A. Kelly, Marc DeSisto, Carroll, Kelly & Murphy, Providence, David F. Sweeney, Breslin, Sweeney & Earle, Warwick, for plaintiff.

Michael A. Kelly, Michael D. Mitchell, Adler, Pollock & Sheehan, Providence, for defendants.

## OPINION

KELLEHER, Justice.

This is a Superior Court civil action in which Eastern Motor Inns, Inc. (Eastern), seeks a mandatory injunction directing Armand Ricci (Ricci) and his wife to convey to Eastern a two-acre parcel of real estate situated on Mink Street in nearby Seekonk, Massachusetts. The litigants are before us on cross-appeals. Eastern faults the trial justice for his rejection of its claim seeking specific performance. The Riccis challenge the trial justice's dismissal of their counterclaim, seeking damages for (1) breach of contract, (2) slander of title, and (3) a violation of the Massachusetts Unfair and Deceptive Practices Act. Mass.Gen.Laws Ann. ch. 93A, § 2 (West 1984).

When the Riccis purchased the Mink Street parcel sometime in the early 1970s, it was situated in an area zoned for industrial use. After lapse of several years, they decided to sell the parcel and use the proceeds to supplement their retirement income. They entered into a series of contracts to sell the parcel. Each agreement, however, was contingent upon the Riccis' obtaining a zoning change from the town of Seekonk, but the requisite permission was never obtained. On July 15, 1986, the Riccis entered into an agreement with Eastern, a Rhode Island corporation having its principal place of business in East Providence. The Riccis agreed to convey the Mink Street parcel to Eastern for $275,000, subject to terms and conditions that were incorporated into a purchase-and-sales agreement. Eastern intended to operate an eighty-unit motel at the Mink Street location. Such an enterprise required the grant of a zoning modification by the town of Seekonk. Consequently the Ricci–Eastern agreement was made subject to a condition that the requisite zoning change be effectuated. The agreement also provided that the sale was to be effectuated and the conveyance of the real estate to occur within thirty days after the municipality had given its approval.

As the end of 1986 approached, the litigants were still awaiting the approval of the proposed zoning change. The Riccis were concerned about an imminent change in the Internal Revenue Code that would nullify the favorable treatment formerly given a taxpayer's capital gains. The change was to take effect on January 1, 1987. Because of the change the Riccis contacted Eastern and offered to reduce the selling price by $10,000 if Eastern would agree to a "partial closing" with the cash and the deed to be held in escrow pending the final determination of the zoning application.

Eastern agreed to this proposal, and on December 30, 1986, the "escrow closing" took place at the office of Eastern's attorney. There the parties entered into a second agreement, the terms of which were incorporated by reference into the July 15, 1986 agreement. The pertinent terms of

the December 1986 agreement read as follows:

"3. The escrow account, with accrued interest, shall be paid over to the Sellers at such time as the Buyer has received final approval by way of permits, variances or licenses as may be required from the town of Seekonk and no appeals or court actions opposing such permission are then pending.

"4. If such permissions, licenses, variances or permits have not been received by the Buyer by the 1st day of July, 1987, then the escrow agents * * * shall pay over the purchase monies, together with accrued interest thereon, to the Buyer in exchange for a deed for the subject property to the Sellers, Armand H. and Shirley M. Ricci."

In mid-January 1987 the Seekonk town meeting granted the zoning relief sought by the Riccis, and the zoning change became effective when, in early April 1987, the Massachusetts Attorney General approved the town meeting's grant. Prior to his approval a scheduled title closing had been canceled on March 23, 1987, because of the absence of the attorney general's consent. Then, another closing scheduled for May 1987 was canceled because of an alleged hazardous waste problem at the Mink Street site. However, at the end of June 1987, Eastern had learned there was no such danger. Eastern's president, Aldor Glaude (Glaude), testified that he was ready and willing to close at any time during the last week of June, except for the thirtieth when he was scheduled to move into a new apartment.

Ricci, on the other hand, testified that he made several attempts to arrange a closing between June 22 and July 1, 1987, but was thwarted in his attempts to contact Glaude because Glaude's phone remained disconnected while he was in the process of moving into a new apartment. On July 1, 1987, Ricci went to Glaude's new abode with a closing in mind. Glaude, however, informed Ricci that he could not close on that day because he was awaiting the arrival of two individuals—an interior decorator and a television technician. The decorator was to afford Glaude a bit of privacy by the installation of vertical blinds. Glaude's recreational needs were to be met with a modification to his television set so that he and his guests could enjoy "HBO." Eastern's attorney suggested a closing for July 2, 1987, but the suggestion was rejected by the Riccis.

On the next day Eastern recorded the December 30, 1986 agreement in the Seekonk land evidence records. The record indicates that during the period the Mink Street parcel was subject to the Ricci–Eastern agreement, the value of the property had increased substantially. In fact, the Riccis were offered $500,000 for the parcel.

In mid-October 1987 the Riccis filed a motion for summary judgment, claiming that the contract terminated on July 1, 1987, thus barring Eastern's specific-performance claim. Eastern responded by filing a motion for partial summary judgment, seeking specific performance on, the part of the Riccis.

The motions came on for a hearing before a Superior Court justice who denied both motions because he could not determine, as a matter of law,[1] whether the July 1, 1987 closing date was essential to Eastern's right to enforce the agreement. The motion justice specifically found that the December 1986 agreement was ambiguous as a matter of law. Consequently he noted that a determination of the litigants' intent involved a factual determination that could not be resolved by way of summary judgment.

After the motions were denied, the controversy came on before a Superior Court justice who presided over a bifurcated trial. He first considered evidence relative to Eastern's specific-performance claim. At the conclusion of the presentation of evidence for and against Eastern's claim, the

---

1. There was a dispute over the choice of law. The motion justice ruled that the principles governing the specific-performance controversy were the same in both Massachusetts and Rhode Island so there was, in fact, no conflict. Neither litigant challenged this conclusion.

trial justice recessed the trial until he could consider the evidence presented. Three days later he returned to the bench and rendered an oral decision in which he rejected Eastern's claim for specific performance. The jury, which had been impaneled prior to the hearing on Eastern's claim, took its place in the courtroom, and evidence relative to the Riccis' counterclaim began. At the conclusion of the presentation of evidence on their claim, the trial justice directed a verdict for Eastern on all three counts of the counterclaim. We shall first consider Eastern's appeal of the denial of its request for specific performance and then review the trial justice's rejection of the Riccis' counterclaim.

■ The grant of a request for specific performance is not a matter of right but rests within the sound discretion of the trial justice. *Gaglione v. Cardi,* 120 R.I. 534, 540, 388 A.2d 361, 364 (1978). On appeal this court will not disturb a trial justice's ruling on a specific performance claim unless the appellant demonstrates an abuse of discretion or error of law on the part of the trial justice. *See Ludwig v. Kowal,* 419 A.2d 297, 304 (R.I.1980). Furthermore, with respect to factual findings upon which that ruling rests, we have consistently held that in situations in which the parties have submitted a controversy to a trial justice sitting without a jury, the findings of fact made by the court will not be disturbed on appeal unless the appealing party shows that the findings are clearly wrong or that the trial justice misconceived or overlooked material evidence. *Gaglione,* 120 R.I. at 539–40, 388 A.2d at 364.

■ The critical factual finding to which Eastern objects is the trial justice's conclusion that time was of the essence when the parties entered into the December 1986 agreement, making July 1, 1987, the "final

conclusive date for performance of the contract." Eastern had argued that the July 1 date was merely an outside time restraint included for the sole benefit of Eastern and therefore could be waived by Eastern on July 1, 1987.

Whether an agreement makes time of the essence is determined by the intent of the parties to the contract. *See Safeway System, Inc. v. Manuel Bros., Inc.,* 102 R.I. 136, 145, 228 A.2d 851, 856 (1967) (citing *Sal's Furniture Co. v. Peterson,* 86 R.I. 203, 208, 133 A.2d 770, 773 (1957)). That intent may appear by express stipulation in the contract or it may be found in the nature or purpose of the contract or in the circumstances in which it was made. *Id.* Here the trial justice made a detailed review of the pertinent evidence and found that although the "dropdead" provision was inserted at Eastern's request, it was included for the protection of both parties. As noted earlier, he also found that time was of the essence in the performance of this contract. This factual determination finds more than adequate support in the record.

To begin with, Ricci testified that Eastern's attorney,[2] on several occasions during the December 30, 1986 meeting, referred to July 1 as the "dropdead" date of the contract. Ricci insisted it was his understanding that "if this agreement wasn't consummated by July 1st, the agreement was over," that "[i]t was uncontroverted that July 1st was the last day of the contract," and that there was no discussion about including a provision for an extension beyond that date. He further testified that the July 1 date was included so that if zoning approval had not successfully been obtained by July 1, 1987, then Eastern could take its money out of escrow and the

---

**2.** Eastern's attorney at the time the December 1986 agreement was executed was precluded from testifying at trial. The trial justice, in taking this action, relied upon the holding in *Judge v. Janicki,* 118 R.I. 378, 374 A.2d 547 (1977), where this court emphasized that the provisions of the Code of Professional Responsibility DR 5–101(B) and DR 5–102(A) bar a lawyer from acting in the dual capacities of counsel and witness, except in limited circumstances.

The trial justice found that Eastern's original attorney had failed to withdraw as counsel after it had or should have become apparent to him that he was a material witness, and the attorney had also evaded giving his deposition prior to trial. The trial justice was of the belief that if the attorney had been permitted to testify, it would have prejudiced the Riccis' ability to properly prosecute their counterclaim.

deed would be returned to the Riccis. Ricci explained that he and his wife agreed to include the provision in the December 1986 agreement because he knew that if Eastern did not conclude the Mink Street transaction by July 1, 1987, he could then sell the parcel to another party.

Mrs. Ricci testified that her husband expressed concern at the December 30, 1986 meeting about the fate of the $25,000 deposit provided for in the original contract. The deposit provision was not included in the escrow agreement. She further testified that Eastern's attorney indicated that there was no need to have a deposit clause because if a sale had not been completed by July 1, the deed would be returned to the sellers and the money would be returned to the buyer. Only then, according to his wife, after "many" negotiations, did Ricci forego any further discussion about a $25,-000 deposit.

In addition, the attorney who negotiated the December agreement on the Riccis' behalf testified[3] that his understanding of the agreement was the same as Mr. and Mrs. Ricci's. He testified that the "drop-dead" provision was "not in the first draft," that "[i]t came in either the second or third drafts" and "was a new element in the negotiations, and there was a discussion between all the participants that were present as to why this agreement or why this provision was in the contract and what it meant." It was his understanding that "if it was not completed by July 1, then the agreement was over." He also testified that "[b]oth parties agreed to it. It seems to me to protect both parties."

On the other hand, Glaude testified that the purpose of the July 1 date was to reassess the respective positions of the parties. He told the trial justice that if the agreement "was not going to fly on July 1, then we would decide at that point whether we were going to return the deed and retract our money." Because of the conflicting testimony, credibility emerged as a vital issue.

The trial justice ruled that the testimony of the Riccis was "credible, straight forward, believable and persuasive." As far as Glaude's testimony was concerned, the court found the testimony of plaintiff "not credible with respect to the dealings of the parties at the December 30th meeting" and "incredible" with respect to the purpose of the July 1 date. The trial justice then found that "the provisions of paragraph four of the December 30, 1986 agreement were inserted on plaintiff's behalf by plaintiff's counsel for the benefit of the plaintiff and the defendant."

We cannot fault the trial justice for ruling that the provision was for the benefit of both parties. Nor was he clearly wrong when he ruled that time was "of the essence in the contract of December 30, 1986, and that it expired by its terms on July 1, 1987."

■ Eastern also claims that the trial justice erred when he misconceived a portion of the December 1986 transaction involving the $25,000 security deposit. Specifically it claims that the trial justice erroneously determined that the security deposit served as consideration for the December 1986 agreement. However, the $10,000 reduction in the purchase price alone constitutes sufficient consideration for the December 1986 agreement, so there is no further need to address this contention.

■ Eastern also contends that even if time was of the essence in the December 1986 agreement, the trial justice erred in

---

**3.** This attorney was mindful of the provisions of DR 5–102(A) and DR 5–101(B)(1) through (4), of the Code of Professional Responsibility. Although he testified at trial, he had withdrawn as counsel for the Riccis. It should also be noted that this court has amended our Rule 47 by replacing the Code of Professional Responsibility with the Rules of Professional Conduct. Rule 3.7 permits an attorney to testify at a trial in which he is an advocate if (1) the testimony relates to an uncontested matter, (2) the testimony relates to the nature and value of legal services rendered in the case, or (3) disqualification of the lawyer would work a substantial hardship on the client. Also, a lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness, unless precluded from doing so by Rule 1.7 or Rule 1.9. (See appendix.) The Rules of Professional Conduct became effective on November 15, 1988, and are applicable to conduct or actions taking place thereafter.

refusing its request for specific performance. The contention consists of two facets. First, Eastern argues that the trial justice misconstrued the nature of the December 1986 agreement when he ruled that the "dropdead" date terminated the parties' rights and obligations under the July 1986 agreement. Eastern maintains that the July 1986 contract remained in force even after the December 1986 agreement terminated. The basis of this argument is that the December 1986 agreement was intended to operate only as a simple escrow agreement, merely giving each party security for the performance of the July 1986 contract. As such, it is argued, the December 1986 agreement neither merged, modified, nor amended the July 1986 agreement. Eastern then cites *Hakala v. Illinois Dodge City Corp.*, 64 Ill.App.3d 114, 21 Ill.Dec. 1, 380 N.E.2d 1177 (1978), in support of its contention that the July 15 agreement did not merge into the December 30 agreement.

We agree with Eastern that *Hakala* stands for the proposition that escrow agreements do not ordinarily supersede an underlying agreement. We further agree that in light of these particular facts the July 1986 agreement was not superseded by the December 1986 agreement. However, the trial justice did not rule that these agreements merged. Instead he found that the July 1, 1987 date contained in the December 30 agreement was intended by both parties to operate as a final termination date for both the July 1986 and the December 1986 agreements. The parties' rights and obligations under the July 1986 contract were not extinguished by his ruling. He found only that the duration of the July 1986 contract had been modified, thereby rendering time "of the essence." As we have already indicated, there is more than adequate evidence in the record to support this finding.

■ Eastern also claims that even if the July 1, 1987 date was the "final conclusive date for performance of the contract," the trial justice abused his discretion in rejecting its claim for specific performance because, in the circumstances of this case,

July 2, 1987, was sufficiently close in time to "[r]equire" specific performance. Eastern adds that by denying its claim for specific performance, a forfeiture is worked upon it and that equity abhors a forfeiture.

We would again like to emphasize to Eastern that the equitable remedy of specific performance is never required but lies within the sound discretion of the trial justice. *Gaglione*, 120 R.I. at 540, 388 A.2d at 364. Furthermore, although we are cognizant that equity abhors a forfeiture, we would note that equity also abhors bad faith and dilatory action, especially dilatory action that is deliberately undertaken by a party in order to protect his or her own pecuniary interests at the expense of another. *See Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 114–16, 265 A.2d 429, 435–36 (1970). Here the trial justice found that Eastern's behavior was not that of a buyer who was ready, willing, and able. Specifically he found that Ricci tried to schedule a closing with Glaude on several occasions during the last ten days of the contract. After these attempts failed, Ricci sought to contact Eastern's attorney. When he was finally able to contact an associate of Eastern's attorney on the twenty-ninth of June, the associate informed Ricci that he could not go ahead and schedule a closing because he had not heard from Eastern. The attorney also informed Ricci that as of June 29, 1987, he had not yet begun to search the title to the subject property. Such conduct, the trial justice noted, operated to the detriment of the Riccis. The trial justice also found that Eastern's actions were dilatory in that it canceled a number of scheduled closing dates, "virtually did nothing" between June 22, 1987, and July 1, 1987, to effect a closing before the contract lapsed, and simply decided that it would perform only when it would suit its own interests.

And it is clear that there has been no forfeiture in this case. The parties came to an agreement concerning the July 1 date. As noted earlier, the trial justice found, relying upon the testimony of the litigants, that July 1 was the "dropdead" date of the agreement, "a final conclusive date for per-

formance of the contract." Even though the distinguished Professors Corbin and Williston may not have had occasion to employ the phrase "dropdead agreement" in their careers, it is clear that today this phrase has a fixed and well-known meaning. Contracts containing such provisions are to be performed on or before the date specified. Otherwise the contract expires. *See generally Empire Lumber Co. v. Washington Water Power Co.*, 114 Idaho 191, 213, 755 P.2d 1229, 1251 (1987), where a contract contained a "drop dead" date by which a facility had to be "up and running"; *In re American Solar King Corp.*, 90 B.R. 808, 830–31 (W.D.Tex.1988), where a bankruptcy plan had a "drop dead" provision that set the deadline for the plan's funding and distribution. In the case at bar, the contract was not performed by July 1 and thus the contract came to an end.

Therefore, relying upon all the evidence contained in this record, we cannot say that the trial justice abused his discretion by refusing to grant Eastern's claim for specific performance.

■ Eastern's final claim of error is that the trial justice erred by denying its postjudgment motion to amend its complaint. After the trial justice rendered his decision on the specific-performance claim, Eastern moved to amend its complaint in order to include a claim based upon unjust enrichment for money expended toward improvement of the Riccis' property. Specifically, Eastern claimed that the value of the property had been enhanced partly because Eastern and the Riccis successfully obtained a zoning change from the town of Seekonk and that, therefore, Eastern should be reimbursed for the money it expended on behalf of that zoning change. The record indicates that the Riccis and Eastern shared equally the expenses of obtaining the zoning change.

Eastern argues that motions to amend are to be liberally granted when there is no showing that the opposing party will be materially prejudiced thereby. It argues that this principle is equally applicable to postjudgment motions as it is to motions made during the initial pleadings stage. Although we agree with Eastern's contention that motions to amend should be liberally granted in circumstances wherein the opposing party will not be prejudiced, *see generally Wilkinson v. Vesey*, 110 R.I. 606, 633–34, 295 A.2d 676, 692 (1972), we would emphasize that the decision to grant or deny such a motion is committed to the sound discretion of the trial justice. *Inleasing Corp. v. Jessup*, 475 A.2d 989, 992 (R.I.1984). On appeal this court will pay deference to a trial justice's decision to deny a motion to amend, and that decision will not be disturbed in the absence of a clear showing that the trial justice abused his or her discretion. *Id.*

The trial justice acknowledged the fact that the value of the Riccis' property may have been enhanced by the zoning change and recognized that he had the discretionary power under Rule 15(b), of the Superior Court Rules of Civil Procedure to allow even a postjudgment amendment to Eastern's complaint, but he denied the motion because he found that an action for unjust enrichment would not lie as a matter of law.

In charging the trial justice with error in this area, Eastern relies on the authority of the Restatement *Restitution* § 42 (1937) and "Improvements—Measure of Recovery," 24 A.L.R.2d 11 (1952). However, as the Riccis so aptly point out in their brief, § 42 of the Restatement of *Restitution* suggests only that restitution be made when one party, under a "mistaken belief" or "mistake of fact," causes improvements upon the land of another. Similarly, the annotation to which Eastern directs our attention speaks only to improvements made and value conferred under a "mistaken claim or expectation of title." 24 A.L.R.2d at 14. When a party makes improvements or confers a benefit upon the land of another with full knowledge that title is vested in another, or subject to dispute, the improver will not be entitled to restitution under the equitable doctrine of unjust enrichment. *See St. Sava Home v. Christopher*, 113 Pa.Cmwlth. 269, 276, 537 A.2d 69, 72 (1988).

Here the trial justice found that the money expended by Eastern was the ordinary cost of doing business and was spent on the basis of an "arms-length transaction" rather than by mistake or under the color of title. He found that the value enhancement of the Riccis' property was "just simply the result of a business deal" that was brought to an end wherein all parties understood their risks and obligations, particularly with respect to the zoning change. There is more than adequate evidence to support the finding by the trial justice that Eastern expended money toward the zoning change on the Riccis' property with a conscious appreciation of the nature and risk of their transaction rather than under a mistaken belief or mistake of fact. We agree with the trial justice that Eastern is not entitled to relief under the principles of unjust enrichment.

We now turn to the Riccis' appeal from the directed-verdict judgments entered against them by the trial justice on their counterclaim. When ruling on a defendant's motion for directed verdict, the trial justice must examine the evidence in the light most favorable to the plaintiff, without evaluating it for credibility or weighing the evidence, and draw all reasonable inferences in the plaintiff's favor. *Lamoureux v. Davis*, 504 A.2d 449, 451 (R.I.1986). A defendant's motion should be granted, however, in situations in which no evidence has been introduced that would support a verdict in favor of the plaintiff or in which no reasonable minds could differ on the issue that the defendant is entitled to a favorable judgment. *See id.* When this court reviews a trial justice's decision to direct a verdict, we are bound by the same standard as the trial justice. Consequently we shall review the evidence in accordance with that standard to determine whether there exists any issue upon which reasonable minds might draw conflicting conclusions. *See Katz v. Prete*, 459 A.2d 81, 84 (R.I.1983). Unless such an issue exists or the trial justice has committed some other error of law, the decision of the trial justice will not be disturbed. *See id.*

■ In testifying in support of the count alleging a breach of the purchase-and-sales agreement, Ricci testified that it was his belief that the sale to Eastern should have taken place within thirty days after the town meeting approved the change in the zoning classification. The trial justice, in directing a verdict for Eastern on the breach count, pointed out that the zoning change did not take effect until such time as the Massachusetts Attorney General affirmed the town meeting's action. Consequently he dismissed the breach claim. We cannot fault this dismissal.

■ The second facet of the counterclaim was the Riccis' contention that Eastern had slandered their title. In *DeLeo v. Anthony A. Nunes, Inc.*, 546 A.2d 1344 (R.I.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1522, 103 L.Ed.2d 828 (1989), this court pointed out that a plaintiff asserting such a claim is required to prove (1) that the alleged wrongdoer uttered or published a false statement, (2) that the uttering or publishing was malicious, and (3) that the plaintiff suffered a pecuniary loss as a result. 546 A.2d at 1346.

The trial justice's rationale for directing a verdict in Eastern's favor on the slander-of-title count was based upon his conclusion that the Riccis had failed to present sufficient evidence that would establish the requisite malice. He pointed out that the only evidence on the record indicating malice was Glaude's testimony that he felt angry when he was told that the Riccis refused to close on July 2, 1987. The trial justice described the evidence presented by the Riccis on this issue as "extremely thin" and ruled that the evidence of anger, by itself, cannot establish malice.

This court has emphasized that in slander-of-title litigation, the element of malice is not malice in its "worst sense" but such malice as consists of an intent to deceive or injure. *Id.* In order to sustain their action for slander of title, the Riccis were required to demonstrate that Glaude recorded the agreement with full knowledge of its falsity and for the specific purpose of injuring the Riccis. We subscribe to the trial justice's belief that the Riccis had

failed to present any evidence from which the jury could reasonably find that Eastern had full knowledge that it had no interest in the Mink Street parcel on July 3 and recorded the December 1986 agreement with a "specific purpose" of injuring the Riccis.

■ In the final count of their complaint the Riccis assert that Eastern had "engaged in unfair and deceptive trade acts and practices." In making this claim, they rely on Mass.Gen.Laws Ann. ch. 93A, § 11, which in its relative parts states that

"[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by [Mass.Gen.Laws ch. 93A] section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action * * * for damages and such equitable relief * * * as the court deems to be necessary and proper."

Thus, in order to pursue a ch. 93A, § 11 claim against Eastern, the Riccis had to demonstrate that they suffered loss of money or property as a result of Eastern's engaging in some unfair or deceptive act while engaged in trade or commerce.

There is more than adequate evidence in the record to indicate that the Riccis have suffered a loss of money. Eastern was also clearly engaged in trade or commerce within the meaning of chapter 93A. *See Begelfer v. Najarian*, 381 Mass. 177, 190–91, 409 N.E.2d 167, 176 (1980). The critical question is whether there was sufficient evidence contained in the record from which a reasonable juror could find that the Riccis' loss of money was attributable to unfair or deceptive actions undertaken by Eastern.

What is an unfair or a deceptive act is a definitional problem that the Massachusetts lawmakers have "prudently avoided." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App.Ct. 498, 503, 396 N.E.2d 149, 153 (1979), *appeal after remand*, 12 Mass. App.Ct. 990, 429 N.E.2d 50 (1981). The Massachusetts courts have, however, adopted some criteria to facilitate the determination of whether an act is unfair or deceptive under ch. 93A, § 11. Those criteria require a court to look for conduct that is "(1) within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) * * * is immoral, unethical, oppressive, or unscrupulous.'" 8 Mass.App.Ct. at 504, 396 N.E.2d at 153. It must be noted that not every unlawful act is automatically an unfair or a deceptive act, and selfish bargaining and business dealings will not be enough to justify a claim for damages under ch. 93A, § 11. The objectionable conduct must, at the very least, "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id.* In all cases the determination of whether a given practice runs afoul of the criteria set forth by the Massachusetts courts must be made from the circumstances of each case. *Id.*

In the circumstances of this dispute we find that although Eastern's actions might be described as dilatory, this conduct does not rise to the level of "rascality" that is required to support a chapter–93A claim. The Riccis do not direct our attention to, and we are unable to find, any action by Eastern that would satisfy the criteria set forth by the courts of Massachusetts to determine whether an act is unfair or deceptive. The Riccis, on the one hand, concede, in fact, assert, in their brief that neither party was a novice to transactions of this nature and that "[t]he entire contractual relationship was in a strictly business context." Yet, the Riccis, on the other hand, argue that they were dealt with in an unfair and deceptive manner when Eastern refused to close on the last day of the contract after canceling two previously scheduled closings and when Eastern filed the December 1986 agreement in Seekonk's land records two days after the contract terminated. However, as we have already pointed out, the Riccis failed to present sufficient evidence that would indicate that

Eastern recorded the December 1986 agreement with full knowledge that it had no interest in the property and with a specific intent of injuring the Riccis. Thus, when viewing the pertinent portions of the record in the light most favorable to the Riccis, we find they have failed to establish grounds for relief by way of a chapter–93A action.

For the reasons stated, Eastern's appeal is denied and dismissed. The Riccis' appeal is denied and dismissed, and the case is remanded to the Superior Court where the executed deed can be returned to the Riccis and Eastern can receive the funds due it.

MURRAY, Justice, dissenting.

I respectfully dissent and do not join my brethren in affirming that portion of the trial justice's decision insofar as it concludes that time was of the essence to each party's performance under the December 30, 1986 escrow agreement. The competent evidence of record clearly does not establish an intent on the part of the parties to make July 1, 1987, the absolute definitive date for performance of contractual obligations.

The law in this jurisdiction with respect to stipulations to time in contracts has been settled for over thirty years:

"[O]rdinarily contract provisions relating to time do not by their mere presence in an agreement make time of the essence thereof so that the breach of the time element will excuse nonperformance by the other party. We recognize, however, that the parties to a contract have the right to make time of the essence thereof. * * * That the parties to a contract intended to make time of the essence *[1] may appear by express stipulation therein or it [2] may be found in the nature or purpose of the contract or [3] in the circumstances under which it was made.* There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." (Emphasis added.) *Sal's Furni-*

*ture Co. v. Peterson,* 86 R.I. 203, 208, 133 A.2d 770, 773 (1957).

Application of the standard enunciated above puts in focus three undisputed facts significant to the disposition of this case. First, there is no express stipulation in either the July 1986 purchase and sales contract or the December 1986 escrow agreement that time was essential to the performance of each party's obligations. Second, it was Ricci who requested that an escrow closing be held before the year's end solely to avail himself of the favorable capital-gains tax advantages of 1986. And third, the July 1, 1987 "dropdead" date was inserted into the escrow contract at the December 30 closing only upon the insistence of Eastern's attorney.

In light of these uncontested facts, it is most logical to deduce that the sole purpose of the July 1, 1987 deadline was to allow Eastern to walk away from the transaction if all the necessary "permissions, licenses, variances or permits have not been received by the buyer by the first day of July 1987." Upon this view, the trial justice clearly erred in finding that the benefit of the contested contractual provision accrued to both parties.

Having determined that neither the express language nor the purpose of the contract establishes an intent to make time of the essence, an examination of the circumstances in which the escrow agreement was executed is pertinent. The issue in the present case requires an analysis of the evidence to determine the intent and understanding of the parties in drafting the agreement *at the time the contract was made.* See *Safeway System, Inc. v. Manuel Bros., Inc.,* 102 R.I. 136, 145, 228 A.2d 851, 856 (1967) (citing *Sal's Furniture Co. v. Peterson,* 86 R.I. 203, 208, 133 A.2d 770, 773 (1957)). It is apparent from the record that both parties entered into the contract realizing that Ricci had encountered great difficulties in obtaining zoning variances prior to his dealings with Eastern. Equally apparent is the fact that Eastern and Ricci were experienced and sophisticated buyers and sellers of real estate. Yet neither party had communicated directly or through

counsel at the December escrow closing or anytime thereafter that performance by July 1, 1987, was an essential element of the escrow contract.

The majority places much emphasis on facts occurring *after* the contract was executed to conclude that Eastern's course of conduct was dilatory and against the actions of a ready, willing, and able purchaser. The decision to grant specific performance undoubtedly rests in the sound discretion of the trial justice, and the party seeking this equitable remedy must show that he or she was ready, willing, and able to perform his or her contractual obligations. *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 114, 265 A.2d 429, 435 (1970). Further recognized is the principle that parties to a contract cannot flout a provision relating to time in order to suit their own convenience or profit. *Id.* The majority's conclusion, however, overlooks the fact that Eastern clearly had no obligation to' close before July 1, 1987, under the plain language of the agreement, until *all* necessary permits were obtained.

Although we are not endorsing Eastern's somewhat cavalier attitude toward prompt performance of its contractual duties, the unique circumstances of this case justify a fifteen-hour delay in closing. The record indicates that Eastern had assented to and then canceled two previous closings because (1) the Massachusetts Attorney General's office had not issued its final approval of the proposed January zoning change and (2) a potential hazardous-waste problem had been detected on the site. Once these legitimate concerns were alleviated, Eastern informed Ricci that it was ready and willing to close during the last week of June, excepting the thirtieth, despite the fact that a building permit application was still pending. Owing to bungled communications caused mainly by a recent move by Glaude, Eastern's president, the two were unable to meet until July 1, 1987. At this meeting, Ricci refused to close the following day because it would "take away from my vacation time" and because, in his opinion, "the contract was over."

That Eastern was willing to close on July 2, 1987, just fifteen hours after the "closing deadline," was reasonable in the circumstances of the instant case. There is no evidence of bad-faith delay by Eastern. There is no evidence that Ricci suffered or would have suffered any serious detriment because of a fifteen-hour delay in closing. Moreover, Ricci candidly admitted that he knew the property was "worth a lot more" than the agreed price with the newly acquired zoning change and therefore only stood to gain from termination of the contract.

Relying primarily on Ricci's testimony and ignoring key undisputed facts, the majority, in upholding the denial of Eastern's request for specific performance, airbrushes the analysis set forth in *Sal's Furniture Co., supra,* and instead chooses to emphasize, perhaps too heavily, Eastern's postcontractual conduct.

For the reasons delineated, I am unable to join with the majority of the court in concluding that time was of the essence to the Ricci–Eastern agreement.

WEISBERGER, Justice, dissenting.

I join in the dissenting opinion of Justice Murray and completely agree with the rationale expressed therein. I write separately only to express an additional concept that I believe would support both dissenting opinions.

The majority is quite correct in stating that this court has often enunciated the principle that specific performance is not a matter of right but may be granted in the sound discretion of the trial justice. *See, e.g., Gaglione v. Cardi,* 120 R.I. 534, 388 A.2d 361 (1978); *Jakober v. E.M. Loew's Capitol Theatre, Inc.,* 107 R.I. 104, 265 A.2d 429 (1970); *DiBiasio v. DiFazio,* 103 R.I. 565, 239 A.2d 719 (1968). We have also recognized another principle that is not entirely consonant with the notion that the right to specific performance may be given or withheld at the discretion of the trial justice. This doctrine arises out of the general rule that a purchaser in a contract for the sale of real estate becomes the equitable owner of the real estate and the

seller holds legal title merely as security for the purchase price. *Dulgarian v. City of Providence*, 507 A.2d 448 (R.I.1986); *Rustigian v. Celona*, 478 A.2d 187 (R.I. 1984); *George v. Oakhurst Realty, Inc.*, 414 A.2d 471 (R.I.1980); *Jakober v. E.M. Loew's Capitol Theatre, Inc.*, 107 R.I. 104, 265 A.2d 429 (1970). The recognition of equitable ownership derives from the maxim that equity regards as done that which ought to be done. *See Carpenter v. Providence Washington Ins. Co.*, 45 U.S. (4 How.) 185, 11 L.Ed. 931 (1846). What might be construed as an apparent discrepancy between these two bodies of settled principle is explained by Professor Williston in volume 11 of his *Treatise On The Law of Contracts* § 1418A at 665–67 (3d ed. Jaeger 1968):

"Although from its inception, granting specific performance was described as 'within the sound discretion of the chancellor,' and courts still render lip service to this outmoded concept, the great majority would unhesitatingly accept the following statement as expressive of the law:

'Ordinarily the specific performance of a contract to convey land is as much a matter of course as an action of damages for its breach.'"

This court has recognized this very principle in *Fitzgerald v. O'Connell*, 120 R.I. 240, 386 A.2d 1384 (1978). In that case we were called upon to review a denial of specific performance by the trial justice on the ground of laches. In commenting upon the denial of specific performance in the course of reversing the judgment of the Superior Court, Justice Kelleher made the following very pertinent observation:

"There is no dispute that, but for the O'Connells' defense of laches, the Fitzgeralds would be entitled to a decree ordering the O'Connells to specifically perform the contract of sale. The O'Connells chose not to contest the validity of the agreement. Its terms are clear and unambiguous. The seller, Gertrude S. O'Connell, unequivocally promised on behalf of herself and her heirs, successors and assigns, to sell the property to the Fitzgeralds for $500. The Fitzgeralds

have shown that they have always been ready, able and willing to perform their part of the bargain. *Jakober v. E.M. Loew's Capitol Theatre, Inc.* 107 R.I. 104, 265 A.2d 429 (1970). The record indicates the contract was fairly entered into, without misrepresentation, misunderstanding, mistake or fraud. Accordingly, in the absence of the equitable defense interposed by the O'Connells, *the Fitzgeralds would be entitled to have the contract of sale specifically performed.* 8A Thompson, *Real Property* § 4479 at 457 (1963)." (Emphasis added.) *Fitzgerald*, 120 R.I. at 243, 386 A.2d at 1386.

Consequently it appears that Rhode Island has followed and, it is hoped, will continue to follow the general rule that if a clear and unambiguous contract has been entered into between a buyer and a seller of real estate, and the buyer has at all times been ready, willing, and able to perform his or her part of the bargain, the buyer is entitled to specific performance of that contract in the absence of a legitimate and articulable equitable defense. To refuse specific performance in such circumstances would constitute an abuse of the judicial discretion accorded to the trial justice. The rule has been well stated in 8A *Thompson on Real Property* § 4479 at 457 (1963) as follows:

"Where a contract for the sale of real estate is entered into without misunderstanding on the part of the purchaser and without misrepresentation on the part of the vendor, specific performance will be granted as a matter of right and not as a matter of discretion." *See also Parker v. Dameika*, 372 Ill. 235, 23 N.E.2d 52 (1939).

Under this rule it is deceptive to suggest that the trial justice has discretionary power to give or withhold the remedy of specific performance in the absence of a genuine equitable defense. Consequently the term "discretion" in these circumstances tends to be misleading since it may serve to mask the obligation of the trial justice to grant specific performance when the purchaser is entitled to such relief.

In the case at bar it should be noted that the sellers' legal title as security for the purchase price was even further diluted by the escrow deposit of the entire purchase price of $265,000 made on December 30, 1986, in implementation of a "partial closing" (accomplished for the tax advantage of the sellers). After that date the purchase price remained completely paid subject to a refund only in the circumstances set forth in paragraph 4 of the escrow agreement dated December 30, 1986. The provision for refund is set forth in the majority opinion and reads as follows:

"If such permissions, licenses, variances or permits have not been received by the buyer by the 1st day of July, 1987, then the escrow agents, Sweeney and Bissonnette, shall pay over the purchase monies, together with accrued interest thereon, to the buyer in exchange for a deed for the subject property to the sellers, Armand H. and Shirley M. Ricci." (Emphasis added.)

In summary, the contract would be fully implemented by delivery of the purchase price to the sellers and the deed to the buyer unless the necessary zoning changes and permits were not received by the buyer by July 1, 1987. It is undisputed that the zoning change had been received on January 12, 1987, and became final by May of 1987 when the Massachusetts Attorney General formally approved the change. There was on July 1, 1987, only a pending application for a building permit. There was no indication that this building permit would not be granted in the normal course of business. Consequently it was apparent on July 1, 1987, that the escrow agreement would be implemented and there was no basis for repayment of the purchase price to the buyer and return of the deed to the sellers.

Nothing contained in the escrow agreement either specifically provided or even implied that a closing must of necessity take place on July 1, 1987. This was only a date upon which moneys would be refunded to Eastern and the deed returned to the sellers if zoning permits or variances had not been received. As Justice Murray points out in her dissenting opinion, this provision was inserted solely for the benefit of Eastern so that it might abandon the transaction on or after that date if it then appeared that the necessary zoning permissions were not obtainable. It seems obvious in light of the fact that the zoning changes had been obtained that there was no basis for either party to the transaction to withdraw as of July 1, 1987. There is nothing in either the original agreement or the agreement of December 30, 1986, that would justify the contention that a closing must of necessity take place no later than July 1, 1987, or not at all. The majority agrees that equity abhors a forfeiture. To hold that Eastern violated the terms of its contract by failing to close on July 1, even though it was willing to close on July 2, is to create a rigid obligation nowhere to be found in any part of the original contract or escrow agreement entered into by the parties.

To suggest that the trial justice had discretion to forfeit Eastern's interest in this property by reason of the minimal annoyance which Eastern's president visited upon Armand Ricci is completely to ignore the fact that this jockeying of dates did not in any way cause any demonstrable prejudice to the Riccis when one considers the fact that the purchase price was safely in escrow at all times during these negotiations. At most one might conclude that the response of Eastern's president, Aldor Glaude, to Mr. Ricci's request to establish a closing date was somewhat more cavalier than Mr. Ricci might have expected. However, Mr. Ricci's drastic reaction to Glaude's casual attitude could only be considered a magnificent example of overkill.

In my opinion it is unconscionable to forfeit Eastern's equitable title under these circumstances because of a disagreement over a date of closing that could aptly be characterized as a "tempest in a teapot." Equity should never support or condone a forfeiture based upon trivial considerations. See J.N.A. Realty Corp. v. Cross Bay Chelsea, 42 N.Y.2d 392, 397–98, 397 N.Y.S.2d 958, 960–61, 366 N.E.2d 1313, 1316 (1977). In the case at bar an examination of the agreement and the facts dis-

closes no breach of agreement, trivial or otherwise.

I am constrained to conclude that the trial justice erred in his interpretation of the escrow agreement. In the circumstances of this case, he was clearly wrong in determining that time was of the essence and that July 1, 1987, was the final date for closing the transaction, even though a zoning change had been obtained and it was reasonably foreseeable that a final permit would later be granted. I am further of the opinion that the trial justice had no discretion in this case to deny Eastern the remedy of specific performance. I would therefore reverse the judgment of the Superior Court and remand the case with directions to grant the remedy of specific performance and direct the escrow agents to transmit the deed to Eastern and the purchase price to Armand and Shirley Ricci together with interest thereon. I would further authorize and direct the trial justice to consider upon remand whether Eastern had suffered damages as a result of the delay in performing the contract.

### APPENDIX

**Rule 1.7. Conflict of Interest: General Rule.**—(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

**Rule 1.9. Conflict of Interest: Former Client.**—A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known.